ARCHBISHOP LUIS APONTE MARTÍNEZ, Plaintiff and Appellee, *v.* JOSÉ LUIS LUGO, Defendant and Appellant.

No. O-69-255.     Decided November 29, 1971.

*Raúl E. González Díaz* and *Raúl Torres González* for appellant.
*González, Jr., González-Oliver, Blanco Lugo & Morán, Benicio
Sánchez Castaño, Manuel García Cabrera, Luis R. Polo, Heri-
berto Torres Solá,* and *William Feliciano* for appellee.

MR. JUSTICE RIGAU delivered the opinion of the Court.

This case is a vivid example of the wise maxim which
expresses that the price of liberty is eternal vigilance.

■ This is a case of prior restraint exercised by judicial
injunction, prohibiting the publication of a written text. That
injunction is null and void because it constitutes a violation
of the freedom of speech and of the press guaranteed by the
Constitution of Puerto Rico and by the First Amendment of
the Constitution of the United States. Furthermore, said in-
junction constitutes a violation of the "Act to Define Rights
of the People," of February 27, 1902. Subsequently, we shall

refer to the above-mentioned constitutional and legal texts and to the leading cases on this matter.

Towards the end of May 1967, Archbishop Aponte Martínez retained the appellant, José Luis Lugo, as Administrator of the properties of the Catholic Church in Puerto Rico. The accorded salary was $1,200 monthly. The former Administrator, Mr. Bordonada, had resigned. The holdings of said church in Puerto Rico include real property valued at many millions of dollars and considerable sums in cash. Regarding the administration of said properties, a series of deficiencies existed. These had already been pointed out by the former Administrator, Bordonada, in a report to the Archbishop.

When Lugo assumed the office of administrator and began to work as such, he noted a number of problems and irregularities and brought them to the attention of Archbishop Aponte in a series of conferences. These conferences climaxed with the Archbishop's decision to dispense with Lugo's services and he discharged Lugo.

Lugo felt his discharge was unjustified and after several days addressed a report-letter to the Archbishop, dated August 15, 1967. In concluding said letter, Lugo wrote the Archbishop that in the event that he did not receive an answer, he would send copies to the bishops of Puerto Rico, to the Papal Nuncio in Santo Domingo, to the Vatican, to the island priests, to the persons concerned with certain funds, and to the Department of Justice.

In an effort to prevent Lugo from publishing his letter-report, the Archbishop requested, and obtained the injunction which gave rise to this suit. The issue to be determined here is whether the trial judge acted correctly or incorrectly in issuing that injunction.

The Constitution of Puerto Rico provides in its Art. II, § 4, that "No law shall be made abridging the freedom of speech or of the press, or the right of the people peaceably to

assemble and to petition the government for a redress of grievances."

Section 3 of the Act to Define Rights of the People (Sess. Laws 1902, p. 274), 1 L.P.R.A. § 11, provides that "Freedom of speech shall not be impaired and every person in Puerto Rico shall be free to speak, write or publish whatever he will on any subject, being responsible however, for all abuse of that liberty."

The First Amendment of the Constitution of the United States provides, insofar as pertinent, that the Congress "shall make no law . . . abridging the freedom of speech or of the press."

Already in 1914, in *People* v. *García*, 21 P.R.R. 153, 155, *in fine*, we said that "Free speech in Puerto Rico is fully guaranteed by section 3 of an Act to Define the Rights of The People, approved February 27, 1902," and we indicated that in deciding we should not lose sight of this provision "nor of the time-honored constitutional principle" (of freedom of speech and of the press). Of course, nowadays the liberty of expression in Puerto Rico is based on a more solid foundation than a mere statute, since as it is well known, it is guaranteed by the above-cited provisions of the Constitutions of Puerto Rico and of the United States.

In *People* v. *Lastra*, 50 P.R.R. 114, 124 (1936), speaking through the then Chief Justice Del Toro, we stated: "The right to strong, alert, severe, even impassioned criticism cannot be restricted. It belongs to the citizens of a free country. It is theirs and no one may wrest it from them. As to this there is no doubt." In *People* v. *Burgos*, 75 P.R.R. 517, 535 (1953), we indicated that freedom of speech, of the press, and of assembly "are vital to the very existence of democracy." This Court has to its credit its recognition throughout its existence of "the primacy of the freedom of expression" in our constitutional structure. *Mari Bras* v. *Casañas*, 96 P.R.R. 15, 20 (1968).

■ There is no doubt that the appellant may invoke and exercise said right since, irrespective of the fact of his being a citizen of Puerto Rico and of the United States, he is a resident of Puerto Rico. Freedom of speech and of the press are rights of such fundamental character, *Grosjean* v. *American Press Co.*, 297 U.S. 233, 244 (1936), that the Constitution of the United States accords them to citizens as well as to aliens. *Bridges* v. *Wixon*, 326 U.S. 135, 148 (1945). The first amendment does not distinguish between citizens and aliens, and the Fourteenth Amendment prohibits depriving "any person" of the rights conferred upon him. It does not limit its benefits only to citizens.

■ It is the same in Puerto Rico. Our Constitution does not limit freedom of speech and of the press only to citizens, and § 7 of Art. II, which to a great extent is equivalent to the United States Fourteenth Amendment, acknowledges as a fundamental right of "man," among others, the right to liberty. Said section also states that "no person" shall be deprived of his liberty without due process of law. That liberty mentioned in said § 7 comprises, among others, here as well as in the United States, freedom of speech and of the press.

As we have stated before, the guarantees of our Bill of Rights are construed and rendered effective "not in a smaller degree of protection" than that afforded to similar guarantees, by the Supreme Court of the United States. *R.C.A.* v. *Govt. of the Capital*, 91 P.R.R. 404, 414–415 (1964).

■ Undoubtedly, the guarantees of said Act of 1902 and of the Constitution of Puerto Rico, apply to appellant in the most direct possible manner. On the other hand, the guarantees of the First Amendment of the Constitution of the United States also apply for the following reason. Those liberties guaranteed by the First Amendment are part of the liberty protected by the due process of law clause of the Fourteenth

Amendment of said Constitution. *Schneider* v. *State,* 308 U.S. 147, 160 (1939) ; *Lovell* v. *Griffin,* 303 U.S. 444, 450 (1938) ; *De Jonge* v. *Oregon,* 299 U.S. 353, 364 (1937) ; *Grosjean* v. *American Press Co.,* 297 U.S. 233, 244 (1936) ; *Near* v. *Minnesota,* 283 U.S. 697, 707 (1931).

■ Following the above-mentioned judicial policy which we set forth in *R.C.A.* v. *Govt. of the Capital, supra,* we make effective in Puerto Rico, insofar as applicable, the guarantees of the First Amendment which are protected by the Fourteenth Amendment in the federal states. In addition to so doing because of our own conviction, it would be illusory to believe that the Supreme Court of the United States would not insist on affording protection in Puerto Rico to the fundamental constitutional rights of the citizens of the United States. Appellant, as we have stated, is a citizen of the United States. Furthermore, the right of free expression is one of the fundamental rights which pursuant to the Puerto Rican Federal Relations Act shall be honored in this country to the same extent as if Puerto Rico were a state of the federal Union. 64 Stat. 319 (1950) ; § 7, 61 Stat. 772 (1947).

[6] In a series of cases the Supreme Court of the United States has rejected and discredited attempts to exercise prior restraint, particularly where, as in the instant case, it has been sought by injunction. Possibly, the two most important cases in this series are those of *Near* v. *Minnesota,* 283 U.S. 697 (1931) and the recent case of *New York Times Co.* v. *United States,* 403 U.S. 713 (1971). The former, due to the intrinsic value of the opinion of the Court and because of the eminence of the Justices who adopted it, and the latter because of the significance of the matter involved, since the government invoked, although unsuccessfully, the nearly always steamroller argument of national military security.

These two important cases are applicable to the one at bar, because in essence, they are alike: in both of them it was

sought through injunctions to restrain the publication of written materials.

In *Near, supra,* as we said, an injunction was obtained to prohibit the publication of material in a periodical, because said material was considered "malicious, scandalous, and defamatory." From that case it appears that, with all probability, said material was actually malicious, scandalous, and defamatory. In an extraordinary opinion written by the then Chief Justice Charles Evans Hughes, with the concurring votes, among others, of Justices Holmes, Brandeis, and Stone, the Court vacated the injunction and permitted publication. After pointing out that what was sought to be done via injunction constituted "the essence of censorship" (283 U.S. 713), the Court pointed out that the chief purpose of the constitutional guarantee of liberty of the press is precisely that of preventing such restraint.

The Court pointed out that the exercise of freedom of speech and of the press does not depend on the veracity of what is said or published, and that said liberties may not be infringed upon for the purpose of preventing a scandal (283 U.S. 721, *in fine,* and 722). It stated that liberty of the press is indeed essential to the nature of a free state and that said liberty consists in laying no prior restraints upon publications. 283 U.S. 713.

In *Murdock* v. *Pennsylvania,* 319 U.S. 105, the suppression of the publication of certain allegedly annoying literature on religious matters was sought. The court stated that the dissemination of views may not be suppressed because they are unpopular, annoying, or distasteful.

The Supreme Court of the United States has clearly and definitively supported freedom of speech and of the press, and has pointed out that these liberties are guaranteed and shall be guaranteed by the courts, particularly when ideas, which at a given time may be unpopular or distasteful, are being suppressed. *Murdock* v. *Pennsylvania, supra,* and cases *infra:*

This must, of course, be so. Hardly, will anyone be persecuted for repeating the truisms of an epoch. The constitutional safeguard has the purpose of protecting both the publication of those truisms as well as of new or minority ideas. One sole dissenting conscience has the right to express itself. Since the tradition of the United States constitutional law on this matter is an excellent one, it would be prolix to cite the many vigorous and eloquent expressions of the Supreme Court of the United States in defense of liberty of speech and of the press. However, see *Lovell* v. *Griffin,* 303 U.S. 444, 452; *Baumgartner* v. *United States,* 322 U.S. 665, 673–674; *New York Times* v. *Sullivan,* 376 U.S. 254, 269–271; *Cox* v. *Louisiana,* 379 U.S. 536, 551–552; *Carroll* v. *Princess Anne,* 393 U.S. 175, 180–181; *Organization for a Better Austin* v. *Keefe,* 402 U.S. 415.

In *New York Times Co.* v. *United States,* 403 U.S. 713, decided June 30, 1971, the court, after citing *Near* v. *Minnesota, supra,* and other authorities, concluded that the government had not overcome the heavy presumption of unconstitutionality borne by the attempt of prior restraint which it sought to exercise, and upheld the decisions of a District Court of New York, the District Court for the District of Columbia, and the Circuit Court of Appeals for the District of Columbia. The court did not permit the censorship sought by the Government.

■ In *Burstyn* v. *Wilson,* 343 U.S. 495, censure of a motion picture entitled "The Miracle," was sought on the basis that it was "sacrilegious." After reminding once more that the chief purpose of the First Amendment is to prevent prior restraint, the Court decided that the prohibition regarding the exhibition of said motion picture did not lie, because it was unconstitutional.

■ Freedom of expression is, of course, subject to some exceptions, although in the light of the most recent cases

these are becoming fewer. The exercise of this right should be effected·in a morally responsible manner. The civil and democratic way of life presupposes that rights shall not be abused. The case law has established that in time of war, publication of the dates of and movement of ships, the number and disposition of armed forces, the *situs* of military installations, etc., shall not be permitted. It may be asserted that the case at bar is not even remotely comprised by the views which would permit considering it an exception to the constitutional prohibition against prior restraint. In *New York Times Co.* v. *United States, supra,* decided June 30, 1971, the Supreme Court has explicitly reiterated, by quoting what it said in *Bantam Books, Inc.* v. *Sullivan,* 372 U.S. 58, 70, that any system of prior restraint of expression comes to this Court bearing a heavy presumption against its constitutional validity. The case at bar, in no manner whatsoever, rebuts this heavy presumption.

In its Report to the Constitutional Convention of Puerto Rico, the Commission on the Bill of Rights clearly established that:

"This section [§ 4 of our Bill of Rights] corresponds to the remaining provisions of the First Amendment of the Federal Constitution *and incorporates into our Constitution all the historically established law concerning freedom of speech, of the press, of assembly, and of petition for redress.* Sections 3 and 4 cover the general ambit of freedom of conscience, of thought, of expression, and the proper activities to fully exercise, within the most extended liberty, the totality of these rights."[1] (Italics ours.)

The above-quoted words are full of meaning. That historical law not only comprises case law established by the courts of appeal of the United States, like the above-cited cases, but also the probably more valuable part of the political and con-

---

[1] 4 *Diario de Sesiones de la Convención Constituyente de Puerto Rico* 2564, Equity ed. (1961).

stitutional history of that country from its origin as a number of English colonies. That historical background also includes the best Western constitutional thought and tradition. It includes, among others, the names of Sir Edward Coke, John Lock, Montesquieu, Rousseau, Jeremy Bentham, Alexis de Tocqueville, John Stuart Mill, James Madison, Thomas Jefferson, Oliver Wendell Holmes, Jr., Louis Brandeis, Benjamin Cardozo, Earl Warren and William Douglas.[2]

Upon discussing the constitutional guarantee of freedom of expression in the excellent study *La Nueva Constitución de Puerto Rico*, University of Puerto Rico press (1954), prepared by the School of Public Administration of that University, the following is stated at pp. 206–207:

". . . If this is in principle a liberal state, it must be based on the recognition of the liberty of the individuals to free expression of their ideas; that is, that the state cannot ever submit said freedom of expression to previous and concrete decisions of the police power. The system of previous restraint to authorize publications, practiced normally and permanently by absolutist regimes which preceded the appearance of liberalism, is no longer admissible within the latter."

.  .  .  .  .  .  .  .

"The liberal regime only permits the penal restraint *a posteriori* of the offenses which might have been committed by means of oral or written expression in relation to the public order or moral interests of the community . . . ."

For an evaluation of our Constitution and particularly of its Bill of Rights, see the *Informe del Comité para el Estudio*

---

[2] Chafee, *Free Speech in the United States* (1946); Corwin, *The Higher Law Background of American Constitutional Law*, Cornell Paperbacks (1965); Pound, *The Development of Constitutional Guarantees of Liberty* (1957); Ebenstein, *Great Political Thinkers*, 3d ed. (1963) (There is a Spanish translation, *Ediciones de la Revista de Occidente*, Madrid (1965) entitled *Los Grandes Pensadores Políticos*); McIlwain, *Constitutionalism, Ancient and Modern* (1940); Sabine, *A History of Political Theory* (1945) (There is a Spanish translation of the *Fondo de Cultura Económica, México* (1970) entitled *Historia de la Teoría Política*).

*de los Derechos Civiles en Puerto Rico* 105, *Editorial Colegio de Abogados de P.R.* (1959), and also the publication *Los Derechos de Expresión y el Uso de las Vías Públicas en Puerto Rico* 1–4, of the Puerto Rico Civil Rights Commission (1971).

One of the errors pointed out by appellant is to the effect that the order of August 21, 1967, decreeing temporary restraint and the judgment of November 28 of the same year, granting the petition for permanent restraint, both of the trial court, constitute violations of the right of freedom of expression. Said error was incurred. The order and judgment constitute a case of prior restraint which is openly in conflict with the constitutional and statutory provisions and the decisions mentioned in this opinion.

Another of the errors pointed out is to the effect that the trial court erroneously applied the case of *Coll* v. *Biascoechea*, 52 P.R.R. 729 (1938). Irrespective of, and in addition to the historical reality that constitutional law has progressed considerably in the field of human rights after the decision date of that case, it is not applicable. This case involved a quarrel between two dentists who had offices on the same street, one in front of the other. It was found that one of them placed persons in front of the office of the other for the purpose of persuading the latter's clients not to enter his office and go to the office of the former. It was there determined that that act constituted a nuisance, and a restraining order to prohibit the above-mentioned practice was sustained.

The difference between the *Coll* case and the one at bar should be clear. In the former, merely private economic interests were involved. On the contrary, the case at bar deals with one of the most fundamental human rights guaranteed by all modern constitutions: the right to freedom of speech and of the press.

■ Plaintiff-appellee's argument to the effect that the publication of Lugo's report-letter would be scandalous is not

valid, since it has already been decided that that argument is without enough substance to interfere with freedom of speech and of the press. *Near* v. *Minnesota, supra* at pp. 721–722. The report-letter in question deals with matters of public interest. Its publication could have the salutory effect of correcting matters which may be in need of correction. The Archbishop himself admitted that many of the deficiencies, which Lugo pointed out, existed. He did so upon testifying in relation to the report of the former Administrator, Bordonada.

■ Plaintiff's argument to the effect that said report-letter violates his right of privacy also lacks validity. As we have seen from the Supreme Court of the United States cited cases, that argument is not sufficient to defeat freedom of speech and of expression. It is not because we are not here dealing with a private person, but with a public figure. The Archbishop is a public figure in Puerto Rico. He organizes and directs marches in favor of and against legislation; he holds press conferences; he publicly expresses his opinion on public matters, etc. See, *Organization for a Better Austin* v. *Keefe,* 402 U.S. 415 (1971); and *Curtis Publishing Corp.* v. *Butts,* 388 U.S. 130 (1967).

Mr. Chief Justice Warren, in his concurring opinion in *Butts, supra* at p. 164, with very good sense states that public figures who are not public officials are not subject to the restraints of the political process—since they are not elected—and it is for that reason that only public opinion may sometimes deter them from committing excesses. For that purpose it is necessary that public opinion be well-informed regarding them by the exercise of freedom of speech and of the press.

In the defense of human rights—one of which is the liberty of expression here involved—we cannot be indifferent or weak, in view of our contemporary industrial society, which is showing so many signs of repression. In this, as in other matters, an ounce of prevention is worth a pound of cure. In

exercising prevention we generally expend only spiritual energy; the remedy, history has taught us, is bought with spirit and blood. Let us recall the eloquent warning provided by Martin Niemoller, in 1945:

"In Germany, the Nazis first persecuted the Communists but since I was not a Communist I did not protest. Later they came after the Jews, but since I was not a Jew I did not protest. Afterwards, they began persecuting the members of labor unions, but since I was not a member I did not protest. Later they turned against the catholics, but since I was a protestant I had nothing to protest about. Then, they came after me. By that time there was nobody left to protest on behalf of anybody else. Let's make sure this does not happen again."

We do not believe that for civilized man liberty of conscience is less important than physical liberty. If appellant's illegal imprisonment had been here involved, we would have issued a writ of habeas corpus. Since the silencing of a conscience is here involved, we believe that equal priority should be given to this matter.

The temporary restraining order entered in this case on August 21, 1967 by the Superior Court, San Juan Part, shall be reversed, and the judgment of November 28, 1967 rendered by said court in this same case shall be modified, reversing the permanent restraining order which prohibited appellant's publication of his report-letter (Plaintiff's Exhibit 1) of August 15, 1967. Likewise, the penalty to pay plaintiff's attorney's fees imposed upon defendant shall be reversed.

Mr. Chief Justice Negrón Fernández, Mr. Justice Hernández Matos, and Mr. Justice Martín took no part in the decision of this case.