# ORGANIZATION FOR A BETTER AUSTIN
## ET AL. *v.* KEEFE

No. 135. Argued January 20, 1971—Decided May 17, 1971

BURGER, C. J., delivered the opinion of the Court in which BLACK, DOUGLAS, BRENNAN, STEWART, WHITE, MARSHALL, and BLACKMUN, JJ., joined. HARLAN, J., filed a dissenting opinion, *post,* p. 420.

*David C. Long* argued the cause for petitioners. With him on the briefs was *Willard J. Lassers.*

*Thomas W. McNamara* argued the cause for respondent. With him on the brief was *John C. Tucker.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted the writ in this case to consider the claim that an order of the Circuit Court of Cook County, Illinois, enjoining petitioners from distributing leaflets anywhere in the town of Westchester, Illinois, violates petitioners' rights under the Federal Constitution.

Petitioner Organization for a Better Austin (OBA) is a racially integrated community organization in the

Austin neighborhood of Chicago. Respondent is a real estate broker whose office and business activities are in the Austin neighborhood. He resides in Westchester, Illinois, a suburb of Chicago some seven miles from the Austin area.

OBA is an organization whose stated purpose is to "stabilize" the racial ratio in the Austin area. For a number of years the boundary of the Negro segregated area of Chicago has moved progressively west to Austin. OBA, in its efforts to "stabilize" the area—so it describes its program—has opposed and protested various real estate tactics and activities generally known as "blockbusting" or "panic peddling."

It was the contention of OBA that respondent had been one of those who engaged in such tactics, specifically that he aroused the fears of the local white residents that Negroes were coming into the area and then, exploiting the reactions and emotions so aroused, was able to secure listings and sell homes to Negroes. OBA alleged that since 1961 respondent had from time to time actively promoted sales in this manner by means of flyers, phone calls, and personal visits to residents of the area in which his office is located, without regard to whether the persons solicited had expressed any desire to sell their homes. As the "boundary" marking the furthest westward advance of Negroes moved into the Austin area, respondent is alleged to have moved his office along with it.

Community meetings were arranged with respondent to try to persuade him to change his real estate practices. Several other real estate agents were prevailed on to sign an agreement whereby they would not solicit property, by phone, flyer, or visit, in the Austin community. Respondent who has consistently denied that he is engaging in "panic peddling" or "blockbusting" refused to sign, contending that it was his right under Illinois law to solicit real estate business as he saw fit.

Thereafter, during September and October of 1967, members of petitioner organization distributed leaflets in Westchester describing respondent's activities. There was no evidence of picketing in Westchester. The challenged publications, now enjoined, were critical of respondent's real estate practices in the Austin neighborhood; one of the leaflets set out the business card respondent used to solicit listings, quoted him as saying "I only sell to Negroes," cited a Chicago Daily News article describing his real estate activities and accused him of being a "panic peddler." Another leaflet, of the same general order, stated that: "When he signs the agreement, we stop coming to Westchester." Two of the leaflets requested recipients to call respondent at his home phone number and urge him to sign the "no solicitation" agreement. On several days leaflets were given to persons in a Westchester shopping center. On two other occasions leaflets were passed out to some parishioners on their way to or from respondent's church in Westchester. Leaflets were also left at the doors of his neighbors. The trial court found that petitioners' "distribution of leaflets was on all occasions conducted in a peaceful and orderly manner, did not cause any disruption of pedestrian or vehicular traffic, and did not precipitate any fights, disturbances or other breaches of the peace." One of the officers of OBA testified at trial that he hoped that respondent would be induced to sign the no-solicitation agreement by letting "his neighbors know what he was doing to us."

Respondent sought an injunction in the Circuit Court of Cook County, Illinois, on December 20, 1967. After an adversary hearing the trial court entered a temporary injunction enjoining petitioners "from passing out pamphlets, leaflets or literature of any kind, and from picketing, anywhere in the City of Westchester, Illinois."

On appeal to the Appellate Court of Illinois, First District, that court affirmed. It sustained the finding of fact that petitioners' activities in Westchester had invaded respondent's right of privacy, had caused irreparable harm, and were without adequate remedy at law. The Appellate Court appears to have viewed the alleged activities as coercive and intimidating, rather than informative and therefore as not entitled to First Amendment protection. The Appellate Court rested its holding on its belief that the public policy of the State of Illinois strongly favored protection of the privacy of home and family from encroachment of the nature of petitioners' activities.*

It is elementary, of course, that in a case of this kind the courts do not concern themselves with the truth or validity of the publication. Under *Near* v. *Minnesota,* 283 U. S. 697 (1931), the injunction, so far as it imposes prior restraint on speech and publication, constitutes an impermissible restraint on First Amendment rights. Here, as in that case, the injunction operates, not to redress alleged private wrongs, but to suppress, on the

---

*The injunction is termed a "temporary" injunction by the Illinois courts. We have therefore considered whether we may properly decide this case. 28 U. S. C. § 1257. We see nothing in the record that would indicate that the Illinois courts applied a less rigorous standard in issuing and sustaining this injunction than they would with any permanent injunction in the case. Nor is there any indication that the injunction rests on a disputed question of fact that might be resolved differently upon further hearing. Indeed, our reading of the record leads to the conclusion that the issuance of a permanent injunction upon termination of these proceedings will be little more than a formality. Moreover, the temporary injunction here, which has been in effect for over three years, has already had marked impact on petitioners' First Amendment rights. Although the record in this case is not such as to leave the matter entirely free from doubt we conclude we are not without power to decide this case. *Mills* v. *Alabama,* 384 U. S. 214 (1966); *Construction Laborers' Local 438* v. *Curry,* 371 U. S. 542 (1963).

basis of previous publications, distribution of literature "of any kind" in a city of 18,000.

This Court has often recognized that the activity of peaceful pamphleteering is a form of communication protected by the First Amendment. *E. g., Martin* v. *City of Struthers*, 319 U. S. 141 (1943); *Schneider* v. *State*, 308 U. S. 147 (1939); *Lovell* v. *Griffin*, 303 U. S. 444 (1938). In sustaining the injunction, however, the Appellate Court was apparently of the view that petitioners' purpose in distributing their literature was not to inform the public, but to "force" respondent to sign a no-solicitation agreement. The claim that the expressions were intended to exercise a coercive impact on respondent does not remove them from the reach of the First Amendment. Petitioners plainly intended to influence respondent's conduct by their activities; this is not fundamentally different from the function of a newspaper. See *Schneider* v. *State, supra; Thornhill* v. *Alabama*, 310 U. S. 88 (1940). Petitioners were engaged openly and vigorously in making the public aware of respondent's real estate practices. Those practices were offensive to them, as the views and practices of petitioners are no doubt offensive to others. But so long as the means are peaceful, the communication need not meet standards of acceptability.

Any prior restraint on expression comes to this Court with a "heavy presumption" against its constitutional validity. *Carroll* v. *Princess Anne*, 393 U. S. 175, 181 (1968); *Bantam Books, Inc.* v. *Sullivan*, 372 U. S. 58, 70 (1963). Respondent thus carries a heavy burden of showing justification for the imposition of such a restraint. He has not met that burden. No prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices in pamphlets or leaflets warrants use of the injunctive power of a court. Designating the conduct as an in-

vasion of privacy, the apparent basis for the injunction here, is not sufficient to support an injunction against peaceful distribution of informational literature of the nature revealed by this record. *Rowan* v. *United States Post Office Dept.*, 397 U. S. 728 (1970), relied on by respondent, is not in point; the right of privacy involved in that case is not shown here. Among other important distinctions, respondent is not attempting to stop the flow of information into his own household, but to the public. Accordingly, the injunction issued by the Illinois court must be vacated.

*Reversed.*

MR. JUSTICE HARLAN, dissenting.

In deciding this case on the merits, the Court, in my opinion, disregards the express limitation of our appellate jurisdiction to "[f]inal judgments or decrees," 28 U. S. C. § 1257, and does so in a way which undermines the policies behind limiting our review to judgments "rendered by the highest court of a State in which a decision could be had," *ibid.*, and interferes with Illinois' arrangements for the expeditious processing of litigation in its own state courts.

It is plain, and admitted by all, that the "temporary" or "preliminary" injunction entered by the Circuit Court of Cook County and affirmed by the Appellate Court, First District, is not a final judgment. Review of preliminary injunctions is a classic form of interlocutory appeal, which Congress has authorized in limited instances not including review by this Court of state decrees. See 28 U. S. C. §§ 1252, 1253; cf. 28 U. S. C. § 1292 (a)(1). Despite the seemingly absolute provision of the statute, the Court holds that this case is within the judicially created exception for instances in which the affirmance of the interlocutory order by the highest state court decides the merits of the dispute for all practical purposes, leaving the remaining proceedings in the lower courts as

nothing more than a formality. See *Pope* v. *Atlantic Coast Line R. Co.*, 345 U. S. 379, 382 (1953); *Construction Laborers' Local 438* v. *Curry*, 371 U. S. 542, 550–551 (1963); *Mills* v. *Alabama*, 384 U. S. 214, 217–218 (1966). The apparent, though unstated, justification for this is the petitioners' representation in this Court that they have no defense to offer other than their First Amendment contentions, which they assert the Illinois courts have decided against them on the merits. Pet. for Cert. 6.

Even assuming that the latter position is correct,* this case does not fit into the mold of the cases in which this Court has reviewed orders of state supreme courts affirming the grant of preliminary relief, for here the Illinois

---

*Settled Illinois law provides that "[i]t is not, of course, the purpose of a temporary injunction to decide controverted facts or the merits of the case," *Lonergan* v. *Crucible Steel Co. of America*, 37 Ill. 2d 599, 611, 229 N. E. 2d 536, 542 (1967), but "merely to preserve the last actual peaceable uncontested status which preceded the pending suit." *Consumers Digest, Inc.* v. *Consumer Magazine, Inc.*, 92 Ill. App. 2d 54, 61, 235 N. E. 2d 421, 425 (App. Ct., 1st Dist., 1968). "It is enough if [the applicant] can show that he raises a fair question as to the existence of the right which he claims and can satisfy the court that matters should be preserved in their present state until such questions can be disposed of." *Nestor Johnson Mfg. Co.* v. *Goldblatt*, 371 Ill. 570, 574, 21 N. E. 2d 723, 725 (1939). The granting of a preliminary injunction is committed to the sound discretion of the trial judge, and it is reviewable only for abuse of discretion. *Lonergan* v. *Crucible Steel Co. of America, supra*, at 612, 229 N. E. 2d, at 542.

In argument before the Illinois chancellor, petitioners' attorney stated:

"We don't wish to go into lengthy argument on constitutional provisions at this time. We feel that it is only fair that both sides prepare briefs in preparation for a full hearing on the permanent injunction. And, to that end, we just want to point out that these are constitutional questions, on which we feel the law is abundantly clear, and that is a further reason why Your Honor in his discretion, should not see fit to issue a temporary injunction." R. 56.

Supreme Court has never passed on the merits of petitioners' constitutional contentions. If this case were permitted to return to the trial court for consideration of the merits of petitioners' contentions and the entry of final judgment, petitioners would have an appeal as of right directly to the Illinois Supreme Court if that judgment were adverse to them. Ill. Const., Art. 6, § 5; Ill. Sup. Ct. Rules 301, 302 (a). That court would then have an opportunity to correct the errors, if any, in the lower court judgment; or if it failed to do so we would have the benefit of that court's views on the issues here presented. Such review by "the highest court of a State in which a decision could be had" is particularly important in the context of Illinois procedure, which places primary responsibility for review of constitutional contentions in the State Supreme Court. All appeals from final judgments in cases involving a constitutional question must be taken directly to that court, see Ill. Sup. Ct. Rule 302 (a)(2); consequently the intermediate Appellate Court rarely has occasion to engage in constitutional adjudication.

To be sure, the Illinois Supreme Court, by denying petitioners' motion for leave to appeal from the order of the Appellate Court, had an opportunity to rule on the issue presented by this case and declined to do so. However, Illinois has a strong policy against Supreme Court review of interlocutory orders. Until recently the Supreme Court had no direct appellate jurisdiction over judgments of the Appellate Court on interlocutory appeals, but simply reviewed the issues presented by the subsequent final judgment. 6 C. Nichols, Illinois Civil Practice § 5998 (1962 rev. vol. H. Williams & M. Wingersky). Although interlocutory review is now available in the discretion of the Supreme Court, it is "not favored." Ill. Sup. Ct. Rule 318 (b); see also Ill. Sup. Ct. Rule 315 (a). We have ourselves often made a simi-

lar resolution of the competing interests in prompt correction of lower courts' errors on the one hand and in expeditious processing of litigation to final judgment on the other. See R. Stern & E. Gressman, Supreme Court Practice § 4.19 (4th ed. 1969). Under today's decision, Illinois will have to surrender its judgment in these matters if it desires to interpose the State Supreme Court between the subordinate state courts and review by this Court, as the highest-state-court requirement permits it to do. If this Court would respect the final-judgment limitation on our jurisdiction, Illinois would not be put to this choice.

It is, of course, tempting to ignore the proper limitations on our power when the alternative is to delay correction of what the Court today holds was a flagrant error by lower courts. This is particularly true where, as here, a "temporary" injunction has been outstanding for a lengthy period. But the question is not whether we think our intervention in the dispute at this stage would be desirable—although with our overall docket running at about 4,000 cases a Term there is surely much to be said for giving each litigant only one bite at the apple. The policy judgment involved was expressly committed to Congress by Art. III, § 2, of the Constitution, and Congress has spoken in § 1257.

I would respect that congressional judgment and dismiss the writ for lack of jurisdiction.