Della M. Quinn, Individually and as Executive Director of St. Michael's Home, Inc., et al., Appellants, v John Johnson et al., Individually and as Employees of the American Broadcasting Company, Respondents.

First Department, April 5, 1976

*Gerald E. Bodell* of counsel *(Frederick J. Magovern* and *Leonard F. Manning* with him on the brief; *Bodell & Magovern, P.C.,* attorneys), for appellants.

*Philip R. Forlenza* of counsel *(Allen P. Rosiny* with him on the brief; *Hawkins, Delafield & Wood,* attorneys), for respondents.

*L. Kevin Sheridan* of counsel *(Allen F. London* and *Judith A. Levitt* with him on the brief; *W. Bernard Richland, Corporation Counsel),* for Commissioner of the New York City Department of Social Services, *amicus curiae.*

Stevens, P. J. This is an appeal from an order entered March 11, 1976, in the Supreme Court, New York County (Stecher, J.), which denied plaintiffs-appellants' (appellants) motion for a preliminary injunction enjoining defendants-respondents (respondents) from broadcasting or disseminating information concerning appellants or St. Michael's Home, Inc. The main thrust of the appeal seeks reversal of the order insofar as it permits respondents to televise a certain videotape taken at St. Michael's on March 9, 1976.

On March 9, 1976, respondent John Johnson (Johnson) and a WABC-TV camera crew went to St. Michael's in the afternoon and, according to respondents, viewed the premises and filmed two guards at the premises. Later Johnson and the crew returned to St. Michael's accompanied by one Thomas F. Quinn, a child care counselor then employed by St. Michael's, and Catherine Bertucci, a counselor, whose employment had terminated the day before. The visits were prompted by earlier interviews and information which respondents assert indicated a deteriorating situation at St. Michael's, a State licensed institution for the care and treatment of dependent and neglected children.

In an affidavit by Quinn, he states that on the second visit to St. Michael's, he and Bertucci led Johnson and the crew to the girls' dormitory where Quinn opened the door and directed them to the second floor. While in the dormitory, some of the children were filmed and questions which could fairly be described as leading or suggestive were directed to the children with respect to drugs, assaults,etc., to which the children responded. The film, as edited, which counsel assured the court is that which is proposed to be shown, was viewed by this court.

The question before this court is whether under the circumstances here present, a preliminary injunction or temporary restraining order should issue pursuant to CPLR 6301.

There is no doubt that this court has the power to issue such an injunction unless provisions of the Constitutions (US Const, 1st and 14th Amdts; NY Const, art I, § 8) or decisional law prohibit such action. (See Social Services Law, §§ 136, 372, 391.) The enumerated references to the Constitutions deal with freedom of speech and of the press as applicable to the Federal and to State Governments. Essentially, there are declared rights and prescribed limitations.

Blackstone notes in his Commentaries, the following:

"The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press: but if he publishes what is improper, mischievous, or illegal, he must take the consequence of his own temerity. To subject the press to the restrictive power of a licenser, as was formerly done,

both before and since the revolution, is to subject all freedom of sentiment to the prejudices of one man, and make him the arbitrary and infallible judge of all controverted points in learning, religion and government. But to punish (as the law does at present) any dangerous or offensive writings, which, when published, shall on a fair and impartial trial be adjudged of a pernicious tendency, is necessary for the preservation of peace and good order, of government and religion, the only solid foundations of civil liberty. Thus, the will of individuals is still left free; the abuse only of that free will is the object of legal punishment.

"Neither is any restraint hereby laid upon freedom of thought or inquiry: liberty of private sentiment is still left; the disseminating or making public, of bad sentiments, destructive of the ends of society, is the crime which society corrects." (4 Blackstone Commentaries, pp 151-152 [1791].)

The First Amendment forbids Congress to make any law abridging the freedom of speech or of the press, the main purpose being to prevent previous restraint upon publications. While the Fourteenth Amendment has been construed to prohibit State action with respect to certain guaranteed freedoms, the State of New York has emphatically declared the right of citizens to "freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to *restrain* or abridge the liberty of speech or of the press." (NY Const, art I, § 8; emphasis added.) "Freedom of speech in its essence involves no previous restraint upon utterance or publication. It does not confer immunity, for abuse of the right will subject the offender to legal punishment." *(Lewis v American Federation of Tel. & Radio Artists,* 34 NY2d 265, 272.) While the protection of freedom of the press is not absolute, the burden of demonstrating a condition which warrants a prior restraint is indeed a heavy one. Television broadcasting falls under the umbrella of protection afforded the press for it too in matters such as the subject under review, is engaged in the dissemination of information of public concern.

We recognize that there are here competing interests, competing rights and values. The children at this home are minors and wards of the State. The intrusion was upon private property without authorization from those in charge of St. Michael's. Additionally, since the children interviewed were minors it is questionable that they could or did validly

consent to the intrusion upon their privacy. If abuse be demonstrated, the respondents doubtless will be called to account.

After viewing the videotape we are not persuaded that its sole or even its chief object is to provide information which could lead to a correction of the conditions it claims exist. However, nothing appears on the videotape which, in our opinion, warrants a prior restraint upon its exhibition. The appellants have not met the heavy burden of showing a justification for the imposition of a prior restraint (cf. *Organization for a Better Austin v Keefe,* 402 US 415, 419; *Miami Herald Pub. Co. v Tornillo,* 418 US 241; *Southeastern Promotions, Ltd. v Conrad,* 420 US 546).

*Commonwealth v Wiseman* (356 Mass 251) cited in the dissenting opinion, may be distinguished. In that case the Commonwealth of Massachusetts was a party to the litigation, and the suit was to enjoin all showings of film taken at a correctional institution to which could be committed defective delinquents and insane persons charged with crime. The Superior Court enjoined showing of the film and required the film makers to deliver film to the Attorney General for destruction. The plaintiffs appealed because the final decree did not impose a constructive trust upon receipts for past showings of the film. The Supreme Judicial Court of Massachusetts in modifying the decree noted that defendants in negotiating for permission to film the inmates had "represented in writing that only pictures of inmates 'legally competent to sign releases' would be used and that the 'question of competency would * * * be determined by the Superintendent and his staff'" (p 257). This condition was found to have been breached and there was found also as a result to have been an invasion of the privacy of inmates who were unable to give consent. Defendants were found to have violated the permission given and to have failed to comply with valid conditions. The court did not reach or consider the basic constitutional question of prior restraint.

The order appealed from should be affirmed, without costs. However, a stay of the order appealed from shall continue for five days after service upon appellants of notice of the entry of the order of this court determining the appeal (CPLR 5519, subd [e]).

KUPFERMAN, J. (concurring [dissenting as to the further stay]). After viewing the proposed broadcast tape, I conclude

that this is investigative reporting done with restraint and high purpose. No injunction was warranted under any view of the First Amendment. The stay and any restraint should be vacated immediately.

BIRNS, J. (concurring). Whether the "news" episode under review is a good example of "investigative reporting" or demonstrative of "restraint" or "high purpose" is irrelevant.

A good motive rarely will excuse an action forbidden by law, and then only under narrowly circumscribed emergency conditions (Penal Law, § 35.05). Here, appellants made some showing that the news or information to be broadcast through television was procured unlawfully by trespass (Penal Law, §§ 140.05, 140.10, 140.15) and that the respondents intruded upon the privacy of infants, wards of the court. However, such activity, we agree, does not warrant the imposition of an order restraining a news broadcast based upon said episode. Under existing case law no prior restraint on such broadcast would be warranted, certainly in the circumstances of this case (cf. *New York Times Co. v United States,* 403 US 713; see, also Rights in Conflict: Report of the Twentieth Century Fund Task Force on Justice, Publicity, and the First Amendment, New York, 1976).

Further, an intrusion into an area of protected privacy is insufficient to bar the dissemination of news *(Organization for a Better Austin v Keefe,* 402 US 415). A prior restraint on expression comes into court, with a "heavy presumption against its constitutional validity" *(Carroll v Princess Anne,* 393 US 175; *Bantam Books v Sullivan,* 372 US 58, 70), and those who seek a prior restraint carry a "heavy burden of showing justification for the imposition of such a restraint" *(Organization for a Better Austin, supra,* p 419). This burden has not been met in this case despite the provisions of sections 136, 372 and 391 of our Social Services Law.

CAPOZZOLI, J. (dissenting in part). After viewing the film involved in this litigation, I am in accord with the majority that, although it was obtained as a result of a trespass, it is, nevertheless, protected by the First Amendment and can be exhibited. *(New York Times Co. v United States,* 403 US 713 [Pentagon Papers].) This, however, does not dispose of the question presented concerning the rights of these children, who are wards of the State, to be protected by the State from exploitation by the respondents, or anyone else. The film in

the main, is protected by the Constitution, as it clearly involves freedom of the press and the public's right to know. But this constitutional protection does not extend to that portion of the film which shows the children being questioned in their rooms, by the use of pointed and leading questions, concerning rapes, assaults, pregnancies of teenagers and the use of drugs and alcohol. Respondents certainly can publish the questions and the answers obtained, but they should not be permitted to disclose the identities of the children or put them on public exhibition on television.

As I understand the position of the appellants, according to page 18 of the brief submitted, it is only exhibition of those pictures and taped dialogues which they seek to restrain. In support of this position the appellants point to the fact that these children have been placed in the home as a result of procedures found in the Social Services Law of the State of New York. They are represented as suffering from a wide range of problems from mental retardation to psychological disturbances. They are wards of the State and the State stands in the position of *parens patriae,* as substitute parents. Therefore the State must discharge its duty of proper supervision and protection for them. What parent would allow his child, under the circumstances disclosed in this case, to be exhibited on public television? Can a parent be so insensitive as to disregard the possible emotional and future harm that might come to these children if exhibition is allowed?

This case, in my opinion, is similar to *Commonwealth v Wiseman* (356 Mass 251) where the court would not permit the showing of a film depicting identifiable persons, who were inmates of a State institution, as it would have resulted in their humiliation and exploitation. That court held that it was the duty and responsibility of the State to protect such individuals, stating in part as follows (p 258):

"The film shows many inmates in situations which would be degrading to a person of normal mentality and sensitivity. * * * These inmates are sufficiently clearly exhibited * * * to enable acquaintances to identify them. * * * There is a collective, indecent intrusion into the most private aspects of the lives of these unfortunate persons in the Commonwealth's custody. * * *

"We think, in any event, that [the] * * * massive, unrestrained invasion of the intimate lives of these State patients may be prevented by properly framed injunctive relief. The

Commonwealth has standing and a duty to protect reasonably, and in a manner consistent with other public interests, the inmates from any invasions of their privacy substantially greater than those inevitably arising from the very fact of confinement. [Citing case.]"

The attempt of the respondents to distinguish that case from the case at bar, because it also presented a contractual issue, is unimpressive. The language of the court makes clear that it was not talking of contractual rights, but of the human rights of the inmates.

Whatever may be the rights of the respondents, as against the appellants, that relationship does not control the obligations which are owed by the State to these children, which the State should enforce.

Therefore, I dissent in part from that portion of the majority's determination which refuses to restrain the respondents from showing the children at the time they were questioned by the representatives of the respondents in the children's rooms and I would restrain same.

MARKEWICH, J., concurs with STEVENS, P.J.; BIRNS J., concurs in an opinion; KUPFERMAN, J., concurs but dissents as to the further stay in an opinion; CAPOZZOLI, J., dissents in part in an opinion.

Order, Supreme Court, New York County entered on March 11, 1976, affirmed, without costs and without disbursements. However, a stay of the order appealed from shall continue for five days after service upon appellants by respondents of a copy of the order entered herein, with notice of entry (CPLR 5519, subd [e]).