FRANCES E. KEMNER *et al.*, Plaintiffs-Appellees, v. NORFOLK AND WESTERN RAILWAY COMPANY, Defendant (Monsanto Company, Defendant-Appellant and Third-Party Plaintiff, v. Willamette Western Corporation, Third-Party Defendant).

Fifth District No. 5—84—0248

Opinion filed March 27, 1985.

KARNS, J., dissenting.

Kenneth R. Heineman and Bruce D. Ryder, both of Coburn, Croft & Putzell, of Belleville, and James C. Craven, P.C., of Springfield, for appellant.

Rex Carr, of Belleville, for appellees.

PRESIDING JUSTICE JONES delivered the opinion of the court:
This case involves 22 consolidated actions brought against Norfolk and Western Railway Company and Monsanto Company (Monsanto) to recover for injuries allegedly arising out of a train derailment and

dioxin spill in Sturgeon, Missouri. During the course of the trial, the court entered an order prohibiting Monsanto, maker of the chemicals containing the dioxin, from communicating with the news media regarding the case. Monsanto has appealed from this order, contending that the order constituted an impermissible prior restraint of its right of free speech in that it was entered without the necessary showing of threat to the administration of justice and was impermissibly overbroad. We affirm.

In their complaints, filed on or about October 30, 1980, in the circuit court of St. Clair County, Illinois, the plaintiffs alleged that they sustained personal injury and property damage as a result of exposure to chemicals contained in a railroad tank car that derailed at Sturgeon, Missouri, on January 10, 1979. These chemicals, which were manufactured by Monsanto in St. Clair County, were allegedly contaminated with dioxin, described by the plaintiffs as "one of the most highly poisonous and toxic substances known to man." Following consolidation of their cases, the plaintiffs joined in filing two additional counts for punitive damages, in which they again asserted that dioxin is a "highly toxic chemical" that could cause "serious, severe, permanent and disabling injuries to human bodies, organs and nervous systems." Trial of these consolidated cases began on February 8, 1984, and was expected to last for a year.

On March 1, 1984, officials from the National Institute of Occupational Safety and Health (NIOSH) held a news conference in St. Louis, Missouri. At that news conference, NIOSH officials announced that a former employee of a St. Louis trucking company who had been exposed to dioxin had developed a sarcoma or cancerous tumor. The NIOSH news conference received extensive local media coverage in which it was stated the NIOSH viewed the incidence of cancer as "significant," "suggestive," and "highly suspicious." While the NIOSH report had indicated that it was not possible to determine whether the employee's cancer was of the type linked to dioxin exposure, this point was not made explicit in most news accounts of the story.

Two weeks later, on March 15, 1984, Monsanto sent a letter entitled "Background Information for St. Louis Area News Media" to 14 media organizations in and around St. Louis. The letter, drafted by Dan R. Bishop, director of environmental communications for Monsanto, set forth what Monsanto perceived to be inaccuracies in the NIOSH report. The letter concluded:

> "Why is Monsanto concerned? We make no secret of the fact that we have a vested interest in seeing that news coverage of

dioxin-related matters is balanced, straightforward and above all, accurate. We have no involvement in the truck terminal issue per se. But we are currently a defendant in a lawsuit in St. Clair County, Illinois, in which several residents of Sturgeon, Mo., claim they are suffering *or* will in the future suffer health problems from alleged exposure of dioxin stemming from a 1979 train derailment and chemical spill.

The jury, which is presently hearing this case, is *not* sequestered, i.e., they are free to view and listen to local news reports. Obviously we're concerned that the jurors may have heard or read some of the exaggerated NIOSH pronouncements stemming from the March 1 news conference. In closing, we want to make it clear that we are not interested in keeping this 'non-story' alive by discussing it publicly. We merely hope that by calling your attention to the basic facts that relate specifically to the March 1 NIOSH announcement, we can sensitize you to the need to be careful, responsible and accurate in the way dioxin subjects are reported in the future."

On March 17, 1984, the Belleville News Democrat carried a UPI story entitled: "Monsanto Takes Aim at Government Report." Following a discussion of the NIOSH news conference, the newspaper story stated in part:

"Monsanto Thursday released a 2½-page attack on the institute's [*sic*] announcement. Monsanto said the agency's assumptions were technically flawed, but also said it feared press reports would hurt its standing in a lawsuit stemming from a Norfolk & Western Railroad derailment in Sturgeon, Missouri, on Jan. 10, 1979."

The story continued with an account of Monsanto's background information letter, including Monsanto's statement that it was concerned that jurors in the St. Clair County lawsuit may have heard or read "the exaggerated NIOSH pronouncements."

On March 19, 1984, the plaintiffs requested a hearing on a petition to have Monsanto held in contempt for attempting to influence the jury in violation of the court's rules governing communication with jurors outside the courtroom. The plaintiffs further sought an order that Monsanto refrain from issuing any type of press release related to the subject matter of the trial during the time the case was being tried. The plaintiffs' motion made reference to the background information letter released by Monsanto, alleging that it was part of an ongoing scheme by Monsanto to influence the outcome of the trial.

Monsanto subsequently filed a memorandum of law in opposition

to the plaintiffs' motion, attaching an affidavit by Bishop in which he stated that it had not been Monsanto's intent that the letter be published in story form as a press release or that the statements in the letter be communicated to the jurors of St. Clair County. Bishop stated, rather, that he had set out Monsanto's vested interest in insuring that dioxin news was reported accurately so as not to "taint our credibility with the press." At a hearing on the plaintiffs' motion, counsel for Monsanto stated further:

"I can assure you that we have no intention of mentioning this litigation and to the extent that it is mentioned in this particular—these exhibits that are attached to our memoranda, I can assure you that that will not occur again. I do believe that Mr. Bishop's conduct was not contemptuous of this Court. I think he explains the reason why he said what he did, why he mentioned this litigation, in order to have the media understand why it was important for them to be truthful, but there will not be any further mention of this lawsuit in St. Clair County, and as long as the Court is assured that that is covered, I don't know how in the world you can constitutionally prevent us from participating in this public debate[.]

\* \* \*

That public debate is not directed to this lawsuit, and we have no intention of making any reference to this particular litigation."

In its order, entered April 2, 1984, the trial court observed that Monsanto was a logical participant in a nationwide debate on dioxin as well as a defendant in the instant cause and that, while engaging in this debate, Monsanto had made specific mention of the present litigation. The court recognized Monsanto's right to participate in the debate on dioxin but stated that this right did "not extend to actions calculated to, or reasonably foreseeable to [sic], influence jurors on [the] case in progress." The court continued:

"The action of Monsanto in that debate, specifically the reference to this lawsuit and its jurors as a rationale for their participation in the debate, constitutes a serious and imminent threat to the administration of justice and the integrity of that process. It placed in the stream of local media, linked to national media, a linkage of that debate to this case, in which the possible lenth [sic] of trial is six months to one year and the jury is not sequestered. No one claims the jury has been so influenced; no one requires this Court to be blind to possibilities. The argument that this action of Monsanto was taken in a

background context, not specifically for publication, only affects the form of resultant media action and not its danger to the administration of justice; the media notice of this case and linkage with positions of the litigants in the dioxin debate can and have still resulted."

The court then ruled as follows:

"1. Defendant Monsanto Company shall not in any press release, background statement, interview, publication or any other contact with the media, by any agent, servant, employee, attorney or independent contractor, mention this case or intimate its existence or its trial or any particular facts or circumstances or positions of parties concerning it until judgment is entered by this Court. The term "media" includes local, national and multi-national, print and electronic.

2. Defendant Monsanto Company is prohibited from taking any action outside this courtroom that is calculated to or is reasonably foreseeable to [sic] influence any juror in this cause.

3. Monsanto Company is in no way prohibited from engaging in the current national debate on dioxin apart from the specific restrictions attributable to the integrity of the administration of justice in this case."

■■ ■ Upon interlocutory appeal from this order (see 87 Ill. 2d R. 307(a)(1)), Monsanto contends that the trial court's order constituted an improper prior restraint upon its right of free speech in that it lacked the necessary factual basis and was impermissibly overbroad. The difficulties inherent in reconciling the constitutional right of free speech with the constitutional right to a fair trial have been well documented. (See, *e.g., Nebraska Press Association v. Stuart* (1976), 427 U.S. 539, 49 L. Ed. 2d 683, 96 S. Ct. 2791; *State ex rel. Miami Herald Publishing Co. v. McIntosh* (Fla. 1977), 340 So. 2d 904; *Cooper v. Rockford Newspapers, Inc.* (1975), 34 Ill. App. 3d 645, 339 N.E.2d 477.) It is established that any prior restraint on free speech bears a heavy presumption against its constitutional validity (*Nebraska Press Association v. Stuart* (1976), 427 U.S. 539, 49 L. Ed. 2d 683, 96 S. Ct. 2791) and may be imposed only where necessary to obviate a serious and imminent threat to the administration of justice. (*CBS, Inc. v. Young* (6th Cir. 1975), 522 F.2d 234; *United States v. Columbia Broadcasting System, Inc.* (5th Cir. 1974), 497 F.2d 102; *State ex rel. Miami Herald Publishing Co. v. McIntosh* (Fla. 1977), 340 So. 2d 904.) The trial court, on the other hand, has the duty to control the course and conduct of the trial and to protect its processes from prejudicial outside influences. (*Sheppard v. Maxwell* (1966), 384 U.S. 333, 16 L. Ed.

2d 600, 86 S. Ct. 1507; *Chicago Council of Lawyers v. Bauer* (7th Cir. 1975), 522 F.2d 242; *State ex rel. Miami Herald Publishing Co. v. McIntosh* (Fla. 1977), 340 So. 2d 904.) Thus, in entering a restrictive order, the court must balance the rights of free speech and fair trial to assure that justice and fairness prevail in each case (*State ex rel. Miami Herald Publishing Co. v. McIntosh* (Fla. 1977), 340 So. 2d 904), and such an order will not be upheld if it is overbroad or if reasonable alternatives short of prior restraint are available. *Nebraska Press Association v. Stuart* (1976), 427 U.S. 539, 49 L. Ed. 2d 683, 96 S. Ct. 2791; *CBS, Inc. v. Young* (6th Cir. 1975), 522 F.2d 234.

■ While, in the instant case, Monsanto contends that there was an insufficient showing of threat to the administration of justice, we believe the record supports the trial court's finding of serious and imminent threat as a result of Monsanto's communication with the media regarding this case. As noted by the trial court, Monsanto specifically referred to the instant case as its rationale for providing information to the press, and it further stated its vested interest in seeing that jurors in *this* case not be given a one-sided or unbalanced view of the effects of dioxin. Since this was undoubtedly one of the issues involved in the plaintiffs' case, Monsanto's communication to the media represented an attempt to shape the jury's opinion, and ultimately its verdict, by means other than the presentation of evidence at trial.

It is a fundamental principle that issues in a judicial proceeding should be resolved in the courts and not in the news media or in the streets. Monsanto's seeming argument, then, that its actions were justified by the "massive amounts" of publicity adverse to Monsanto in past years is not well taken. Any allegedly improper communication with the media by the plaintiffs or their counsel should be countered by Monsanto, not with publicity of its own, but with an appropriate petition to the court presiding over the cause. We note, however, that the publicity complained of by Monsanto resulting from the NIOSH news conference was not attributable to the plaintiffs, and where Monsanto has neither alleged nor sought redress for improper communication with the media by the plaintiffs, there was no basis for the trial court to extend its order to preclude comment by the plaintiffs.

Because of the direct reference made by Monsanto here to a pending case, the instant case is distinguishable from *Quinn v. Aetna Life & Casualty Co.* (E.D.N.Y. 1979), 482 F. Supp. 22, *aff'd* (2d Cir. 1980), 616 F.2d 38, relied upon by Monsanto, in which the court upheld the right of the defendant insurance company to run advertisements urging lower jury awards to the general reading public. While, in *Quinn*,

three personal injury actions were pending against Aetna in State courts at the time the advertisements appeared, no reference was made to any of these suits, and the advertisements, characterized as "protected political expression" on issues of public concern, were directed to the public at large rather than to specific jurors. By contrast, Monsanto here linked its discussion on dioxin to this particular lawsuit, with the result that it was so linked in the newspaper's subsequent story on the subject. Because of this linkage to the instant case, Monsanto's communication with the media regarding dioxin cannot be characterized as general public expression, as was the case in *Quinn*.

The potential for harm to the judicial process as a result of Monsanto's comments directed towards the jurors of the instant case is more pronounced because of the ongoing and protracted nature of the litigation here and the fact that the jury is not sequestered. Since the trial was in progress at the time of the offending publicity, this case is distinguishable from those instances cited by Monsanto where the potential for prejudice from pretrial publicity was insufficient to warrant a restrictive order. (*Cf. CBS, Inc. v. Young* (6th Cir. 1975), 522 F.2d 234 (pretrial publicity not sufficiently harmful to warrant restrictive order where impaneling of jury effected with little difficulty); *Chase v. Robson* (7th Cir. 1970), 435 F.2d 1059 (pretrial order restricting publicity improperly based upon press releases issued seven months earlier); *Cooper v. Rockford Newspapers, Inc.* (1975), 34 Ill. App. 3d 645, 339 N.E.2d 477 (editorial published two months prior to date set for completion of discovery in libel case insufficient basis for restrictive order).) The trial here, moreover, has already extended for over a year and may continue for several months. Considering the enormous waste of time and resources in the event of a mistrial occasioned by a showing of jury influence, we agree with the trial court's assessment that actual prejudice need not have occurred before entry of the instant order. Rather, the order was justified as a cautionary measure to preclude further efforts by Monsanto to affect the outcome of this trial while participating in the public debate on dioxin.

 While Monsanto additionally challenges the instant order as unconstitutionally overbroad, we believe the order was acceptable in that it did not restrict Monsanto's right to engage in a public discussion of dioxin other than in connection with the pending trial. It is settled that a restrictive order, even when warranted to achieve a fair trial, must be narrowly drawn so as not to prohibit speech within first amendment rights that would not be prejudicial to a fair trial. (*Cooper v. Rockford Newspapers, Inc.* (1975), 34 Ill. App. 3d 645, 399 N.E.2d

477.) In the instant case, the issue as Monsanto has framed it is Monsanto's right to participate in the "ongoing national debate" regarding dioxin and its effects. The trial court, in seeking to accommodate this right with the plaintiffs' right to a fair trial, explicitly recognized Monsanto's position as participant in the debate on dioxin and limited Monsanto's expression in this regard only as it related to the instant case. We note that while Monsanto now characterizes this limitation as an "intolerable burden" and asserts that the court's order is "incapable of interpretation" except at its peril, Monsanto's own counsel assured the court, during argument on the plaintiffs' motion, that the public debate on dioxin was not directed towards this lawsuit and would be carried on without further mention of the instant litigation. We find nothing in the court's order to preclude Monsanto from so engaging in this public debate, and we accordingly decline to reverse the court's order on this basis.

Finally, because of the unique nature of this suit as discussed above, we believe the trial court properly determined that alternative measures were inappropriate to preserve the integrity of the proceeding before it. (See generally *Nebraska Press Association v. Stuart* (1976), 427 U.S. 539, 49 L. Ed. 2d 683, 96 S. Ct. 2791, for discussion of measures short of prior restraint to mitigate adverse effects of publicity.) This case did not involve pretrial publicity, the effect of which could be alleviated through *voir dire* questioning of prospective jurors, and the length of the trial made it impractical to have a sequestered jury. Further, while, as Monsanto notes, the jurors would be continually admonished during the trial not to read, watch or listen to anything concerning the case outside the courtroom, Monsanto's own actions here in seeking to have its views reflected in the media give the lie to the efficacy of this measure.

For the reasons stated in this opinion we find no error in the trial court's order, and we accordingly affirm the order of the circuit court of St. Clair County.

Affirmed.

KASSERMAN, J., concurs.

JUSTICE KARNS, dissenting:
This prior restraint on freedom of speech, which is ambiguous and overbroad, is not necessary to insure the object sought to be attained, namely, a fair trial. Such restraints on speech are always suspect. (*Near v. Minnesota* (1931), 283 U.S. 697, 75 L. Ed. 1357, 51 S. Ct.

625.) The press release, or news release, however characterized, that occasioned the injunctive order does not appear likely to reoccur, considering the profuse apology and assurances given the court by counsel for the defendant. The injunction was issued solely because of this one letter sent to the news media in the St. Louis metropolitan area.

While Monsanto is assured that it is free to engage in the national debate on dioxin so long as no mention of this case or "intimation" of its existence or the trial is made, one can understand its reluctance to do so while this injunctive order is in effect. The Supreme Court has stated that "[a]ny prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity. [Citations.] Respondent thus carries a heavy burden of showing justification for the imposition of such a restraint." (*Organization for a Better Austin v. Keefe* (1971), 402 U.S. 415, 419, 29 L. Ed. 2d 1, 5-6, 91 S. Ct. 1575, 1578.) The mere presence of this order has a "chilling" effect on protected speech and certainly would discourage conversation or communication with the news media about any aspect of dioxin inasmuch as the words used might be perceived to "intimate" the existence of "this case" or "its trial."

The permissible limits of speech under the court's order present problems similar to those addressed by the court in *Chicago Council of Lawyers v. Bauer* (7th Cir. 1975), 522 F.2d 242, where the "no-comment" rules of the District Court for the Northern District of Illinois were scrutinized under the free speech guarantees of the first amendment and were found to an impermissible, overbroad prior restraint on freedom of speech.

Furthermore, this injunctive restraint on speech is not necessary. Any attempt by a party in a pending action to influence the outcome of the litigation by communicating with the jury or in any manner attempting to influence the jury is a contemptuous act and may be punished by the court by the imposition of appropriate punishment and sanctions. It is also a crime under the Criminal Code of 1961. Ill. Rev. Stat. 1983, ch. 38, par. 32—4.

In short, if this injunctive order prohibits what is clearly proscribed by well established rules of conduct which prevent litigants and counsel from communicating with jurors, it is unnecessary. (*CBS, Inc. v. Young* (6th Cir. 1975), 522 F.2d 234; 87 Ill. 2d R. 7—108.) If it does more, it is an impermissible prior restraint on freedom of speech.