STATE of Wisconsin, Plaintiff-Respondent,

v.

Todd MITCHELL, Defendant-Appellant,†

Court of Appeals

*No. 90-2474-CR. Submitted on briefs April 29, 1991.—Decided June 5, 1991.*

(Also reported in 473 N.W.2d 1.)

†Petition to review granted.

On behalf of the defendant-appellant, the cause was submitted on the brief of *Bernard Goldstein* of *Goldstein & Kagen* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle,* attorney general, and *Paul Lundsten,* assistant attorney general.

Before Nettesheim, P.J., Brown and Anderson, JJ.

BROWN, J. Todd Mitchell challenges the constitutionality of the "hate crimes" penalty enhancer law in Wisconsin, sec. 939.645, Stats., claiming that it is vague and overbroad and violates equal protection principles. We hold that the statute clearly gives persons of ordinary intelligence fair notice of the conduct prohibited, provides standards for those who enforce the laws, and does not "chill" citizens from exercising protected constitutional freedoms. Thus, the statute is neither vague nor overbroad. We will not reach the equal protection issues because of waiver. We also discuss other nonconstitutional issues and affirm.

Gregory Reddick, a fourteen-year-old white male, was walking down a street near the Renault apartment building in Kenosha. He was wearing "British Knights" brand athletic shoes. Several black males rushed across the street at Reddick, knocked him to the ground, surrounded him, and beat him until he was unconscious. Police found him a short time later, still unconscious, and with his shoes missing. Reddick was severely injured; he was comatose for about four days; and his injuries might have been fatal had he not received medical treatment.

Testimony revealed the following facts about the beating and theft. A group of young black men and boys were gathered at the Renault apartment building on the evening of the incident. Mitchell, who was nineteen at

the time, was one of the older members of the group. Some of the group were inside the apartment complex discussing the movie "Mississippi Burning;" in particular, they were talking about that part of the movie where a white man beat a young black boy who was praying. There was no evidence that Mitchell was involved in this discussion.

About ten members of the group that was inside moved outdoors. There, people were talking about the movie. Before the victim appeared, Mitchell said to the gathering, "Do you all feel hyped up to move on some white people?"

A short time later, Reddick approached on the other side of the street. Reddick said nothing provocative. Mitchell said, "You all want to fuck somebody up?" Then he said, "There goes a white boy; go get him." He counted to three and pointed this way and that way, indicating that the group should surround Reddick.

Several persons in the group immediately took off running toward the white youth. Most ran directly at him. One person in the group kicked Reddick, knocking him to the ground. Several attackers then surrounded Reddick and repeatedly stomped, kicked and punched him. This lasted about five minutes. One of the attackers said he thought Reddick was dead.

One of the attackers returned from the beating possessing Reddick's "British Knights" shoes. He showed them to different people. Mitchell was in the area when the shoes were being shown.

Mitchell was convicted of aggravated battery, party to a crime, and the jury separately found that Mitchell intentionally selected the battery victim because of the victim's race, pursuant to sec. 939.645, Stats. Mitchell was also convicted of theft, party to a crime.

657

Mitchell's major challenge is to the constitutionality of sec. 939.645, Stats., dubbed the "hate crimes" statute. The constitutionality of a statute is a question of law which this court may review without deference to the trial court. *State ex rel. Jones v. Gerhardstein,* 141 Wis. 2d 710, 733, 416 N.W.2d 883, 892 (1987). Here, there is not even a trial court opinion to review, as the constitutionality issues are raised for the first time on appeal. Nonetheless, challenges to the facial constitutionality of statutes are a matter of subject matter jurisdiction and, therefore, cannot be waived. *State ex rel. Skinkis v. Treffert,* 90 Wis. 2d 528, 536–39, 280 N.W.2d 316, 320–21 (Ct. App. 1979). The equal protection argument, however, is not a challenge to a facial constitutionality of the statute. We deem this specific argument waived and we will not address it.

Before addressing Mitchell's vagueness and overbreadth challenges to sec. 939.645, Stats., we briefly touch upon the burden he must carry. Generally, when a defendant challenges the constitutionality of a statute, he or she bears the heavy burden of establishing beyond a reasonable doubt that the statute is unconstitutional. *State v. Dums,* 149 Wis. 2d 314, 319–20, 440 N.W.2d 814, 815–16 (Ct. App. 1989). The defendant must do this in light of the strong presumption favoring the constitutionality of the statute. *State v. Hurd,* 135 Wis. 2d 266, 271, 400 N.W.2d 42, 44 (Ct. App. 1986).

There is an exception to that rule. When a statute infringes on the exercise of first amendment rights, the burden of establishing its constitutionality is on its proponent. *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419 (1971). Mitchell claims that the statute

658

punishes activities protected by the first amendment. He therefore argues that the state has the burden in this case. For the reasons that follow, we disagree and impose the burden on Mitchell himself.

We first discuss the vagueness argument. Section 939.645, Stats., provides an increase in penalties for any person committing a crime under chs. 939 to 948, Stats., who, in addition:

> *Intentionally selects* the person against whom the crime . . . is committed or selects the property which is damaged or otherwise affected by the crime . . . because of the *race,* religion, *color,* disability, sexual orientation, national origin or ancestry of that person or the owner or occupant of that property.

Section 939.645(1)(b), Stats. (emphasis added).

Mitchell points to two terms in the statute, "intentionally selects" and "race" as being undefined and ambiguous. He claims two consequences result. First, that the statute fails to give proper notice of prohibited conduct. Second, that the statute encourages arbitrary or erratic convictions because there are no guidelines for prosecutors or police.

Mitchell's claims track the two-step process in determining vagueness claims. The steps are: (1) the statute must be sufficiently definite to give persons of ordinary intelligence who seek to avoid its penalties fair notice of the conduct required or prohibited; and (2) the statute must provide standards for those who enforce the laws and adjudicate guilt. *State v. McManus,* 152 Wis. 2d 113, 135, 447 N.W.2d 654, 662 (1989).

A legal principle to be kept in mind when analyzing a statute for vagueness is that the statute need not define

with absolute clarity and precision what is and what is not unlawful conduct. *Hurd,* 135 Wis. 2d at 272, 400 N.W.2d at 45. For the statute to be unconstitutional, the ambiguity must be such that "one bent on obedience may not discern when the region of proscribed conduct is neared, or such that the trier of fact in ascertaining guilt or innocence is relegated to creating and applying its own standards of culpability rather than applying standards prescribed in the statute or rule." *State v. Courtney,* 74 Wis. 2d 705, 711, 247 N.W.2d 714, 719 (1976).

It should be further noted that a defendant who plainly falls within the prohibited zone of a statute cannot mount a vagueness challenge by building a case for some hypothetical person who might lie outside the zone. *See id.* at 713, 247 N.W.2d at 719.

The first claim is that the terms "intentionally selects" and "race" are not defined in the statute and are incapable of clear understanding by an ordinary person. We do not agree. The word "intentionally" is defined in the criminal code. Section 939.23(3), Stats., states in pertinent part:

> "Intentionally" means that the actor either has a purpose to do the thing or cause the result specified, or is aware that his or her conduct is practically certain to cause that result. In addition . . . the actor must have knowledge of those facts which are necessary to make his or her conduct criminal and which are set forth after the word "intentionally."

Thus, the word "intentionally" means a purpose to do the things specified. It is easily defined.

660

The word "selects" is also easily defined. We find it difficult to believe that persons of ordinary intelligence would not understand what this word means. Even so, when undefined, nontechnical words are used in a statute, they are given their ordinary and accepted meaning which may be ascertained from a recognized dictionary. *State v. Wittrock,* 119 Wis. 2d 664, 670, 350 N.W.2d 647, 651 (1984). Webster defines "select" as "to take by preference from a number or group: pick out." *Webster's New Collegiate Dictionary* 1047 (1977). Therefore, the term "intentionally selects" means to purposely pick out.

Mitchell also argues that the word "race" is ambiguous. We construe his argument here to be that persons of ordinary intelligence do not know the difference between the term "race" and "color," another term used in the statute. We do not need to resort to a recognized dictionary to resolve this claim. Reddick was white and is of a different race and color than the attackers. The statute prohibits purposely picking out a person of race or color. Under either term, the law was violated. We do not understand, and Mitchell does not enlighten us, how he has standing to raise this particular argument since his conduct plainly falls within the prohibited zone of the statute regardless of the literary difference between the terms "race" and "color." This issue is meritless and we discuss it no further.

Having determined that the term "intentionally selects" is easily defined, we turn to what we consider to be Mitchell's major argument regarding vagueness. Assuming that "intentionally selects" means to purposely pick out, Mitchell apparently argues that the term is still ambiguous as applied. If we understand Mitchell's argument correctly, the underlying rationale for Mitchell's attention to the term "intentionally selects" is this:

Any time an accused is a different race than the alleged victim, it can be viewed as a "hate crime" suitable for use of the penalty enhancer since there is no way to discern whether the victim was picked out because of race or because of other reasons. Under the statute, the very fact that this particular victim *was* picked out indicates that the victim was "intentionally selected." Therefore, Mitchell argues that so long as the accused "knows" the victim is of a different race, a different color or a different religion, the accused will be subject to the statute. This, he claims, allows its use by prosecutors and police without any guidelines.

We disagree. The operative term in the statute is not whether a person "intentionally selects" a victim. Most, if not all, criminals can be said to "intentionally select" their victims. Nor is the operative term whether that victim who is intentionally selected is of a different "race" or "color," for instance. The operative term is "because." If a person is selected *because of* race, color, disability, and the like, then the statute becomes operative. If a victim is of a different race, for instance, than the perpetrator, that fact alone will not allow the penalty enhancer to be used. Nor will it be enough that the perpetrator "picked out" or "selected" a person of a different race. The key is whether the selection was *on account of* race. If there is proof of that, then the enhancer becomes operative.

Thus, the statute is not vague on its face. People of ordinary intelligence can read the statute and determine that if they intentionally select a victim who happens to be of a different race, for example, they will not be subject to an enhancer. However, if they select that victim *because of* race, they will be subject to it. This also provides a proper standard for prosecutors and police.

They must have some evidence that the victim was selected because of race. The vagueness argument fails.

We next discuss overbreadth. A statute may be constitutionally overbroad if it intrudes on a substantial amount of constitutionally protected activity. Our supreme court explained overbreadth as follows:

> A statue [sic] is overbroad when its language, given its normal meaning, is so sweeping that its sanctions may be applied to constitutionally protected conduct which the state is not permitted to regulate. The essential vice of an overbroad law is that by sweeping protected activity within its reach it deters citizens from exercising their protected constitutional freedoms, the so-called "chilling effect."

*Bachowski v. Salamone,* 139 Wis. 2d 397, 411, 407 N.W.2d 533, 539 (1987) (citations omitted).

Unlike a vagueness argument, an overbreadth challenge may include hypothetical speculation. Therefore, even if no "chilling effect" was present in the defendant's particular case, a defendant may still argue that the statute is overbroad because it chills the rights of others. *See City of Milwaukee v. Wilson,* 96 Wis. 2d 11, 19–20, 291 N.W.2d 452, 457–58 (1980). This is true when the alleged overbreadth implicates free speech rights. *See id.*

We agree with the state that Mitchell's overbreadth argument is "hard to follow." He appears to assert that the statute is overbroad because it punishes free speech. He seems to argue that slurs, epithets, derogatory and racial expressions are simply part of everyday human behavior and are protected free speech when not involved in the commission of a crime. He apparently

argues that there is no good reason why this same free speech should not also be protected during the commission of a crime. He seems to reason that the statute is criminalizing speech just because the perpetrator exercises his or her freedom of speech at the same time as the commission of a crime. By allowing the state to use the defendant's verbal statements against him, the state thereby discourages free speech.

We disagree that there is an infirmity in the statute on overbreadth grounds. The statute is directed at the action of selecting a victim and not at speech. Section 939.645, Stats., does not impede or punish the right of persons to express themselves regarding race or any other status or group listed. Words, or even beliefs, are not punished here. What *is* punished is conduct. The words used by a defendant are merely circumstantial evidence that the defendant specially selected the victim because of race or for other reasons listed. *Cf. People v. Grupe,* 532 N.Y.S.2d 815, 818 (N.Y. Crim. Ct. 1988).

Thus, evidence of the words uttered by a defendant are used no differently than they are in other criminal statutes. The words are simply probative as to an element of a crime. Here, Mitchell's words were evidence that he intentionally selected Reddick because of race. That is why Mitchell has the burden of proof in this case instead of the state. The statute does not proscribe free speech. It is not a law limiting the time, place or manner of speech. It is a law proscribing certain conduct where words can be used as circumstantial evidence of such conduct.

Mitchell next asserts that his conviction for aiding and abetting the theft of the victim's shoes is not supported by the record. Primarily, he argues that there was no evidence showing his intent to commit a theft or

participate in a theft. In particular, he reasons that, although the jury may infer that he incited a battery, they may not infer that he intended to encourage a theft. He asserts that the person who stole the shoes did so on his own and without any encouragement or aid from Mitchell.

We do not agree. The jury had evidence from which it could infer that Mitchell encouraged and directed people to "move on" and "fuck up" the victim. We agree with the state that this encouragement was general and not limited to inflicting injury. By encouraging and directing the persons who attacked, Mitchell assisted the criminal mischief. The resultant beating, leaving the victim incapacitated, was one natural and probable consequence of the encouragement. The theft of the shoes was another. Although Mitchell raises other arguments about the theft conviction, they are all variations of the same theme—that the encouragement was for the purposes of battery and must be separated from any act of theft since Mitchell did not intend for a theft to take place. However, we hold that the theft is a natural and probable consequence of his incitement, just as was the battery.[1]

*By the Court.*—Judgments and order affirmed.

---

[1]One of Mitchell's arguments is that the trial court never instructed on the "natural and probable consequences." The record indicates that there was such an instruction given.