841 A.2d 10

## The CITY OF FREDERICK

v.

## RANDALL FAMILY, LLC, t/a The Frederick News Post, et al.

### The City of Frederick

v.

### Daniel A. Trey.

Nos. 1965, 1967, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Jan. 28, 2004.

544

Howard J. Schulman (Schulman & Kaufman, LLC, on brief), Baltimore, for appellant.

Henry R. Abrams, Kimberly A. Manuelides (Saul Ewing, LLP, on brief), Baltimore, for appellee.

Argued before SALMON, JAMES R. EYLER, and ADKINS, JJ.

SALMON, J.

After learning that Angelika Potter was running a house of prostitution in the City of Frederick ("the City"), the City Police obtained a warrant that allowed them to search Ms. Potter's home and apartment and to seize records found there. The warrant was executed on July 29, 1999; the police seized computer equipment, computer records, and numerous documents containing the names, addresses, and other data relating to Ms. Potter's customers.

The State's Attorney for Frederick County recused himself from prosecuting the Potter case due to an allegation that a relative of an employee of the State's Attorney's office worked for Ms. Potter. An Assistant State's Attorney for Montgomery County was appointed to investigate and, if warranted, bring charges. After considering the matter, charges were brought against Ms. Potter in the District Court for Frederick County.

On November 15, 2000, Ms. Potter entered a guilty plea to the charge of operating a house of assignation—a misdemeanor. As part of a plea agreement, the District Court judge struck the finding of guilt and entered a finding of probation before judgment. The only conditions of probation were that

Ms. Potter pay a $100 fine, plus $55 court costs. The State agreed, as part of the plea bargain, to return to Ms. Potter all the documents and other material seized pursuant to the search warrant.

Immediately after Ms. Potter received the probation-before-judgment disposition, public interest in the documents and other items seized (hereafter "the black book") was piqued by Charlene Edmonds, who was then president of the Frederick chapter of the National Association for the Advancement of Colored People. Ms. Edmonds had been in the news because City police officers, acting on orders of the Chief of Police, R.R. Raffensberger, had improperly harassed Ms. Edmonds by placing her under police surveillance. These charges were sustained, and as a result, Chief Raffensberger was demoted one rank by the Mayor of Frederick. Following Ms. Potter's plea, Ms. Edmonds made the following allegations concerning what she perceived to be the lenient treatment that Ms. Potter received:

1. Among Ms. Potter's customers were various unnamed public officials and prominent members of the Frederick community, whose names were listed in the black book;

2. Had the police gone forward with a trial against Ms. Potter, names of the public officials and other individuals mentioned in the black book would have been revealed by evidence introduced at trial;

3. Ms. Edmonds had received an anonymous tip that Frederick City Alderman Blane Young had been protective of Chief Raffensberger [in regard to the improper surveillance charge] because Mr. Young, and others associated with him, were named in the black book;

4. According to the anonymous tip, upper echelons of the police department acted to cover up the fact that these names were contained in the black book in exchange for Mr. Young's support of upper echelon officers in the department.

On November 22, 2000, the Randall Family, LLC, t/a the Frederick News Post ("News Post"), by Steven Miller, a News

Post staff writer, made a request for copies of the records seized in the police raid.[1] The request read:

> Please make available for inspection and copy evidence related to *State of Maryland v. Angelika Elisabeth Potter* (6U–21769 Frederick County District Court).

> The evidence was seized by police on July 29, 1999[,] at 8765 Treasure Ave., Walkersville[,] MD. and at 350A Prospect Blvd., Apt. 104, Frederick[,] MD.

> Items requested for inspection and copy include the content of several address book computer programs used as a client list; record keeping books; spiral notebooks used as appointment books; and contents of Microsoft Money program used for business accounting.

The request was addressed to the City and was made pursuant to the Maryland Public Information Act ("MPIA"), which is codified in sections 10–611 through 10–629 of the State Government Article ("SG") of the Maryland Code (1984, 1999 Repl.Vol.). On November 27, 2000, the Associated Press ("the AP") also made a MPIA request of the City, which was, in all material respects, similar to that made by the News Post. Daniel Trey, a resident of Thurmont, Maryland, on January 3, 2001, also filed a MPIA request, which was modeled after the earlier ones by the AP and the News Post.

Debra Borden, who was designated by the City as a representative of the custodian of the records seized by the police (and also an Assistant City Attorney for Frederick), denied all

---

1. One day earlier, on November 21, 2000, the News Post made another request of the City under the Maryland Public Information Act. That request, unlike the November 22, 2000, request, demanded production of a "list of items seized" in the police raid, together with a copy of the search warrant. The City gave the News Post a copy of the search warrant. The City did not produce a list of items seized in the search; that list of items seized, however, is not at issue in this appeal because at the hearing at which partial summary judgment was argued, counsel for appellees stressed, several times, that the plaintiffs wanted to inspect *only* what had been seized but not any documents prepared by the police department. Therefore, denial of the November 21, 2000, request is not at issue in this appeal.

three MPIA requests. In doing so, she relied on section 10–618(f)(1)(i) of the MPIA, which reads:

(f) Investigations.—(1) Subject to paragraph (2) of this subsection, a custodian may deny inspection of: (i) records of investigation conducted by . . . a police department. . . .

The denial letters all included the following paragraph:

The items you requested are records of an investigation conducted by the Frederick Police Department for a law enforcement purpose, therefore we may lawfully deny your request. In accordance with § 10–614(b)(3)(ii) of the Public Information Act, you are hereby notified of the available remedies for review of this decision with respect to the denied material. You may, but are not required to, file an administrative appeal with this agency upon request. Public Information Act § 10–622. In addition, you may file an action with the Circuit Court for Frederick County, Maryland to enforce the provisions of the Maryland Public Information Act under the authority granted in § 10–623 of the Act.[2]

The News Post and the AP promptly filed a joint Administrative Appeal in which they contended that the City had no right, under the MPIA, to deny them access to the contents of the black book. The request for administrative hearing was filed pursuant to the City of Frederick's Public Information Act Rules and Regulations.

Lynn Board, the City Attorney, was named as the MPIA hearing officer by the mayor. Ms. Board conducted a hearing on December 22, 2000, concerning the denial of the requests. Debra Borden, the Assistant City Attorney and the person who had denied the request, represented the City at the hearing. Ms. Borden, in addition, was the most important witness who testified at that hearing.

---

2. Under SG section 10–622(b), a requester, who is denied access to public records, has a right to seek administrative review of the denial. A requester is not required, however, to file an administrative appeal or otherwise exhaust administrative remedies prior to filing a complaint in the circuit court. *See* SG § 10–622(c).

During the presentation of the City's case-in-chief, Ms. Borden said that the City denied the MPIA request pursuant to the "investigative records exception" set forth in section 10–618(f)(1)(i) of the statute. She gave no details. After the City rested its case, counsel for the News Post moved for judgment on the ground that the City's reasons for denying the request were inadequate as a matter of law. Ms. Borden then asked to reopen the City's case because she did not "feel like [she had] testified. [She had] made legal arguments." She also said that reopening was justified because it was "difficult to be the lawyer and the witness at the same time." The motion to reopen was granted.

Ms. Borden then testified that prior to denying the MPIA request she looked at all the documents in the police investigation file concerning Angelika Potter. She opined that the police investigation exception to the MPIA applies even if the police investigation file has been closed. She also said that prior to denying the MPIA requests she considered (1) what is in the public interest in terms of releasing these types of documents and (2) what effect disclosure would have upon the public interest. In her opinion, the purpose of the exception set forth in 10–618(f)(1)(i) "is to give custodians the leeway to make these difficult decisions and to give them the authority to do it based on knowing what's in the documents."

It was established that the "official custodian" of the records in question was Chief Raffensberger. Therefore, prior to the denial of the request, Ms. Borden talked to the chief. She could not remember, however, exactly what Chief Raffensberger said. She did recall that the police chief discussed with her the "ramifications of releasing" names of people who were on Ms. Potter's customer list.

In the course of cross-examination, Ms. Borden cited several other justifications for her decision to deny the MPIA request, *viz:* Disclosure would provide needless publicity to cooperating witnesses; disclosure would be unfair to the parties subject to the investigation and would violate those persons' rights to privacy; and disclosure would not contribute signifi-

cantly to the public's understanding of government, would hinder future law enforcement proceedings, and would reveal sources of police information.

The News Post called its managing editor, Michael Powell, as its only witness. Mr. Powell testified that access to copies of the seized records was necessary to investigate Ms. Edmonds's allegations concerning Chief Raffensberger and in particular to determine "whether there was a connection ... with officials or public figures in Frederick County and with how ... [the Potter] case was handled."

The AP called Denise Cabrerra, the Chief of its Baltimore Bureau. On direct examination, the following exchange occurred:

> As a result of watching and covering the story of allegations of ... personal surveillance [of Ms. Edmonds] and the fact that there had been some disciplinary action against the police chief, in that case, we [the AP] wondered whether her allegations about the black book were also true because, initially, the allegations of the Police Chief's surveillance of her was denied.
>
> Q. Were those [the] allegations that were sustained?
>
> A. Yes, they were sustained and he admitted that he or the mayor—I can't remember if it was the mayor or the police chief—said that it was an act of poor judgment but that, yes, they had—it had happened but it was an act of poor judgment.
>
> Q. And how did the—how would the existence of the black book play into the mayor or police chief's treatment of Ms. Edmonds?
>
> A. Well, the fact that she is being surveilled at all, we wondered whether that had anything to do—her knowledge of this black book had anything to do with the surveillance that was going on, besides her being president of the N.A.A.C.P. and, initially, as I remember initially, David [3]

---

3. The "David" referred to is apparently David Dishneau, the employee of AP who filed the MPIA request on behalf of the AP.

said to me that he hadn't taken that allegation seriously, that this book existed at all.

Q. What, if any, impact or what, if any, concern does AP have with respect to the treatment of a police chief as a result—by the mayor in terms of, I think he was demoted— the police chief was demoted one (1) rank or something?

A. Yes, he was demoted one (1) rank and was on two (2) weeks suspension [several words inaudible].

Q. Is there any relationship between that issue and the allegations about the Potter evidence?

A. Well, our concern is that you have an admission by the chief executive of a city that the chief law enforcement officer has committed a crime and that the punishment for that crime has been virtually minimal and it was, again, a member of a minority community—a leader of the minority community and so, there's public interest in that kind of an action.

At the close of the December 22, 2000, administrative hearing, Ms. Board reserved her decision for sixty days on the pending motion for judgment.

While the administrative appeal was still pending, the City, on January 9, 2001, filed an action for declaratory relief, in which it named Ms. Potter as a defendant and asked the Circuit Court for Frederick County to decide whether Ms. Potter's plea agreement with the State required the City to return all the seized evidence to Ms. Potter. The AP and the News Post, on February 16, 2001, filed a motion to intervene in the declaratory judgment action. Movants also filed a proposed answer and a proposed counter-complaint, in which they sought to enjoin the City from returning any of Ms. Potter's documents pending an administrative determination as to whether they had a right to copies of those documents under the MPIA.

While the motion to intervene was pending, the City and counsel for Ms. Potter agreed that the City should immediately return to Ms. Potter all items obtained pursuant to the search warrant. The pending administrative appeal was dis-

missed, on February 27, 2001, by the City as moot on the grounds that the City (purportedly) no longer possessed the documents that were the subject of the MPIA requests. The next day, February 28, 2001, the City and Ms. Potter filed a joint stipulation of dismissal of the declaratory judgment action. That same day, the City gave Ms. Potter's attorney what its attorneys thought were all the extant copies of the black book.

Upon receiving this material, Ms. Potter's attorney immediately began to shred documents. The News Post and the AP quickly learned of the City's (and Ms. Potter's counsel's) attempt to make an "end run" around the MPIA. Accordingly, these news organizations promptly sought injunctive relief to prevent further spoilation of the documents.

A hearing was held on February 28 at 4 p.m. in the circuit court, concerning the injunction proposed by the News Post and the AP. At the hearing, Ms. Potter's counsel agreed to shred no more documents and to store all documents that had not been destroyed, pending further direction from the court.

On March 5, 2001, the circuit court signed an order directing (1) that no more documents be shredded and (2) that those items that had been given to Ms. Potter's counsel, in whatever form, be placed in a locked storage facility. In compliance with the March 5 order, the existing black book items in Potter's possession were placed in a storage facility by Ms. Potter's counsel with the assistance of a City attorney. The key to that facility was then given to the clerk of the Circuit Court for Frederick County.

On March 23, 2001, the News Post and the AP filed a new action in the Circuit Court for Frederick County in which they named James S. Grimes, the then Mayor of Frederick; Debra S. Borden; Lynn Board; and the City of Frederick as defendants. Count I of the complaint was filed pursuant to section 10–623 of the MPIA.[4] In Count I, the plaintiffs asked the

---

4. Section 10–623 reads, in part:
 **Judicial review.**

court to determine, *inter alia*, whether they were entitled to inspect and copy the items seized by the police. In other counts, plaintiffs asked for damages, both actual and punitive, together with attorney's fees and costs. Shortly after the aforementioned complaint was filed, Daniel Trey filed a substantively similar lawsuit in the Circuit Court for Frederick County. The two lawsuits were later consolidated.

The City filed a lengthy answer to both complaints. Afterward, the News Post and the AP filed a motion for partial summary judgment. Movants asked the court to find, as a matter of law, "that the City should have produced and should now produce" Ms. Potter's black book pursuant to the MPIA. The motion for partial summary judgment was supported by an affidavit of Michael Powell and copies of several newspaper articles relative to Ms. Edmonds's allegation and the Potter matter in general, along with a transcript of the administrative hearing conducted on December 22, 2000.

On October 23, 2001, a hearing on the motion for partial summary judgment was held. Counsel for the City advised the court that attorneys for the City initially thought that they had turned over all of the black book documents to counsel for Ms. Potter on February 28, 2001. It later learned, however, that the police department had retained some of the copies of the documents at issue. To further complicate matters, computers and computer records were turned over to the State Police by the City; the State Police thereafter copied the computer records onto disks and, "sometime in the summer"

---

(a) *Petition authorized.*—Whenever a person or governmental unit is denied inspection of a public record, the person or governmental unit may file a complaint with the circuit court for the county where:
 (1) the complainant resides or has a principal place of business; or
 (2) the public record is located.
 (b) ...
 (2) The defendant:
 (i) has the burden of sustaining a decision to deny inspection of a public record; and
 (ii) in support of the decision, may submit a memorandum to the court.

of 2001, returned the disks to the City.[5] Counsel for the City assured the court that all of the original materials seized in the raid were sent to Ms. Potter's attorney, although counsel for the City did not know which of the original documents had been shredded by Ms. Potter's counsel.

Counsel for the City also advised that the City had no objection if the court allowed release to the plaintiffs of the materials that Ms. Potter's counsel had put in storage. In counsel's words, "[W]e [the City] would love to have . . . [the documents in storage] disclosed." Later counsel for the City said: "[W]e don't care what's in storage. It, it would certainly

---

**5.** The City counsel's representation as to the documents in question was as follows:

[W]hat has occurred is that the state police who had made, [sic] originally there was this computer. The computer was sent to the . . . state police. It was Ms. Potter's computer. They apparently did an analysis of the computer and made disks from that. They returned the computer here. They kept copies or they kept these disks and then returned them to the police department some time during this past summer. That is, the Frederick City Police Department. Then—

THE COURT: So there are, so there are additional disks other—because it's my understanding that those items that are in storage include disks.

[COUNSEL FOR THE CITY]: Well—

THE COURT: That's—maybe I'm wrong on that.

[COUNSEL FOR THE CITY]: But the—

THE COURT: Maybe, maybe I'm getting—

[COUNSEL FOR THE CITY]: They may, they may include disks because I've not seen or been privy to what's . . . in storage. And if they were I would assume from what I know that whatever is in storage would be copies . . . of the originals that were made by the state police. But in any event, those disks were returned to the police department at which time or subsequent to that time the state prosecutor's office asked if they could take a look at 'em, and we forwarded them on to the State Prosecutor's Office. I—

THE COURT: How many copies of those disks are there out there? How many, how many, what is subject to this proceeding? How many—it sounds, it sounds like there are disks in storage and there's a separate set of disks that the State Prosecutor's Office has?

[COUNSEL FOR THE CITY]: Correct. Which I believe are the original disks made by the state police.

THE COURT: Which are . . . actually copies of Ms. Potter's original disks?

[COUNSEL FOR THE CITY]: Her hard drive. Those are the copies of files—

THE COURT: Her hard drive—

eliminate a lot of controversy that's swirled around this if the court would say here, just give those to the papers and let 'em knock themselves out."

Despite its wish that the items in storage be turned over to the press, the City took a contrary position concerning black book material currently in the City's physical possession. As to items in the City's possession, counsel for the City argued that the documents were appropriately withheld under the MPIA for the reasons enunciated by Ms. Borden at the December 22, 2000, hearing.

Counsel for the News Post argued that the justification that Ms. Borden gave at the December 22, 2000, administrative hearing was insufficient to support withholding the documents. Counsel stressed that (1) plaintiffs had not asked to see any documents prepared by the police; (2) instead, plaintiffs wanted to inspect only copies of documents and/or property seized in the raid.

The motions judge orally ruled on October 23, 2001, that the City had failed to justify its refusal with particularity or with specific facts and therefore had not met its burden of proving that withholding the black book was in the public interest.

The motions judge directed counsel for the News Post to prepare an order granting partial summary judgment as to Count I in favor of the AP and the News Post. Counsel for Mr. Trey then orally moved for partial summary judgment on the same ground advanced by the AP and the News Post. The court allowed the City fifteen days to respond to Trey's oral summary judgment motion.

On November 7, 2001, another hearing was held. At the hearing, the court orally granted partial summary judgment in favor of Trey.[6] Also, the motions judge announced his deci-

---

[COUNSEL FOR THE CITY]:—removed from her hard drive. I'm doing this from memory.

**6.** The individual defendants in the cases filed by Trey, the News Post, and the AP were dismissed by the motions judge. Also, the court

sion to add a proviso to the order proposed by the News Post, which would direct the "plaintiffs not to reveal names to the public, except for names of public officials and/or public figures." The plaintiffs' objections to the additional language were unavailing. The court's written order, from which this appeal follows, read in part:

For the reasons set forth in open [c]ourt at the October 23rd hearing, the Plaintiffs' Motion for Partial Summary Judgment be and the same hereby is granted.

It is further Ordered that the City of Frederick shall produce to Plaintiffs those documents in its possession responsive to the Plaintiffs' Public Information Act Requests.

It is further Ordered that those documents responsive to Plaintiffs' Requests that were previously in the City's custody and which are now in the [c]ourt's custody shall be immediately produced to Plaintiffs. The Clerk shall turn over the key to the storage facility where these documents are located to Plaintiffs' designated representative immediately.

Plaintiffs not to publish names to public[,] except for names of public officials and/or public figures.

Plaintiffs' Motion is denied without prejudice as to those documents that may be presently in the custody of the Office of Special Prosecutor.

On November 7, the court also granted the City's motion to certify the orders granting partial summary judgment as final judgments pursuant to Maryland Rule 2–602(b).[7]

---

granted the News Post, and the AP the right to intervene in the declaratory judgment case, which the City and Ms. Potter had attempted to dismiss. Except for some limited discovery, all related matters were stayed pending this appeal.

7. Rule 2–602(b) provides:

(b) **When allowed.** If the court expressly determines in a written order that there is no just reason for delay, it may direct in the order the entry of a final judgment:

(1) as to one or more but fewer than all of the claims or parties; or

**I.**

The City raises three questions on appeal, *viz:*

I. Are plaintiffs "persons of interest" under section 10–611(e) so that the custodian of the police investigatory file is not required to provide a detailed explanation under section 10–618(f)(1) for denying access?

II. Have plaintiffs failed to meet their burden to establish that the custodian of records did not reasonably believe that the denial was in the public interest?

III. Did the circuit court fail to consider the interests of Potter and other persons in interest under the Public Information Act, including denial mandated by State Government code, §§ 10–615 and 10–617?

The News Post filed a cross-appeal, in which it asks:

Whether, having granted in full the News Post's request for records, the trial court's order restricting the use of information in the News Post's possession constituted an impermissible prior restraint?

**II.**

Before determining whether all parts of the motion for partial summary judgment should have been granted, it should be recalled that the court ordered that all documents in the court's custody "shall be immediately produced to the plaintiffs." The documents in the court's custody referred to the unshredded portions of Ms. Potter's black book that the City turned over to Ms. Potter's counsel on February 28, 2001. As mentioned earlier, Ms. Potter's counsel, accompanied by a City attorney, put those materials in a storage facility; the key to the facility was then given to the clerk of the circuit court.

■ In regard to the portion of the partial summary judgment order dealing with documents in the court's custody, the

---

(2) pursuant to Rule 2–501(e)(3), for some but less than all of the amount requested in a claim seeking money relief only.

City has no legitimate ground to now object because it took the position before the motions court that it would welcome the release of all documents in storage. *See Van Royen v. Lacey,* 266 Md. 649, 651–52, 296 A.2d 426 (1972)("A man shall not be allowed to blow hot and cold, to claim at one time and deny at another.")(quoting *Cave v. Mills,* 7 H & W 927 (Court of Exchequer)). Therefore, it is crystal clear that the circuit court was justified in granting partial summary judgment as to MPIA documents in the court's custody.

## III. *ANALYSIS*

### A. *Issue 1*

Was the City required to spell out its reasons for denying the request?

SG section 10–614(b) provides:

(b) *Grant or denial by custodian.*—(1) Within 30 days after receiving an application, the custodian shall grant or deny the application.

(2) A custodian who approves the application shall produce the public record immediately or within the reasonable period that is needed to retrieve the public record, but not to exceed 30 days after receipt of the application.

(3) A custodian who denies the application shall:

(i) immediately notify the applicant;

(ii) within 10 working days, give the applicant a written statement that gives:

1. *the reasons for the denial;*

2. *the legal authority for the denial;* and

3. notice of the remedies under this Part III of this subtitle for review of the denial; and

(iii) permit inspection of any part of the record that is subject to inspection and is reasonably severable.

(4) With the consent of the applicant, any time limit imposed under this subsection may be extended for not more than 30 days.

(Emphasis added.)

From the plain language of section 10–614(b)(3)(ii)(1) and (2), it is clear that Ms. Borden's denial letters to the requesters (i.e., the appellees) was insufficient. Her denial letters set forth the (alleged) "legal authority" for the denial but did not, as she was required to do, give "the reasons for the denial."

SG sections 10–616 and 10–617 set forth exceptions to the general rule that the public has the right to see documents held by government officials. If those exceptions are applicable, the custodian is *required* to deny access to the records. Examples of situations where denial is required are when the requester seeks to review welfare records, letters of reference (§ 10–616(c) and (d)), and financial information—except for salaries of public employees (§ 10–617(b)). SG section 10–618, on the other hand, gives a custodian of records, under certain circumstances, the *discretion* to deny MPIA requests. Section 10–618(a) and (f) provides:

**Permissible denials.**

(a) *In general.*—Unless otherwise provided by law, if a custodian believes that inspection of a part of a public record by the applicant *would be contrary to the public interest,* the custodian may deny inspection by the applicant of that part, as provided in this section.

\* \* \*

(f) *Investigations.*—(1) Subject to paragraph (2) of this subsection, a custodian may deny inspection of:

(i) records of investigations conducted by the Attorney General, a State's Attorney, a city or county attorney, a police department, or a sheriff;

(ii) an investigatory file compiled for any other law enforcement, judicial, correctional, or prosecution purpose; or

(iii) records that contain intelligence information or security procedures of the Attorney General, a State's Attorney, a city or county attorney, a police department, a State or local correctional facility, or a sheriff.

(2) A custodian may deny inspection by a *person in interest* only to the extent that the inspection would:

(i) interfere with a valid and proper law enforcement proceeding;

(ii) deprive another person of a right to a fair trial or an impartial adjudication;

(iii) constitute an unwarranted invasion of personal privacy;

(iv) disclose the identity of a confidential source;

(v) disclose an investigative technique or procedure;

(vi) prejudice an investigation; or

(vii) endanger the life or physical safety of an individual.

(Emphasis added.)

A "person in interest" is defined in the MPIA as "a person or government unit that is the subject of a public record or a designee of the person or governmental unit." *See* SG § 10–611(e)(1). Neither the News Post, the AP, nor Trey are "persons in interest" as defined in the MPIA. Thus, section 10–618(f)(1) is here applicable.

■ When a request for public documents is made by a person in interest, that person is entitled to more favorable treatment under section 10–618(f)(2) of the MPIA than a requester who falls under section 10–618(f)(1). *Office of State Prosecutor v. Judicial Watch, Inc.,* 356 Md. 118, 137, 737 A.2d 592 (1999) (*"Judicial Watch"*). The treatment is more favorable under section 10–618(f)(2) because (1) if the request falls under (f)(2), the custodian can deny the request only for one of the seven reasons set forth in Paragraph (f)(2), whereas under (f)(1) the discretion of the record custodian is broader and the request may be denied if, for any reason, disclosure would be contrary to the public interest; (2) under Paragraph (f)(2), a

particularized showing as to *every document* withheld is necessary. *Judicial Watch,* 356 Md. at 136–37, 737 A.2d 592.

The Court explained in *Mayor & City Council of Baltimore v. Maryland Committee Against the Gun Ban,* 329 Md. 78, 96–97, 617 A.2d 1040 (1993):

Section 10–618(a) speaks of denying inspection "of a part of a public record by the applicant [that] would be contrary to the public interest." Where, as here, the request for inspection relates to the record of a police department investigation and the request is made by other than a person in interest, *the severability provisions of the Act operate in a relatively restricted fashion.* This can be illustrated by comparing paragraph (1) and paragraph (2) of 10–618(f).

Under paragraph (2), inspection may be denied to the person in interest "only to the extent" that the inspection would give rise to one of the seven enumerated circumstances. That statutory mandate requires analyzing the investigation file material in order to distinguish between that which reflects one or more of the enumerated circumstances and that which does not. In contrast, when the request to inspect is made by one other than a person in interest and paragraph (1) applies, the "custodian may deny inspection of . . . records of investigations conducted by . . . a police department." Permissible denial applies to the entire record, to the extent that inspection would be contrary to the public interest.

(Emphasis added.)

From the above, it is plain that under Paragraph (f)(1) a particularized showing is not required as to every document withheld. The question then becomes: When Paragraph (f)(1) is applicable, may a custodian simply refer to the "investigation exception" without providing any particularized facts showing why it would be against the public interest to grant the request?

The City contends that when, as here, section 10–618(f)(1) is applicable, the custodian of record can deny the request without giving "a detailed explanation." We glean from the

City's brief that it also takes the position that it would have been sufficient if Ms. Borden had said at the December 22, 2000, hearing, without elaboration, "We have decided to deny the request under section 10–618(f)(1) because the City believes that divulging the information would be contrary to the public interest." The appellees counter that such a generic denial is permissible under 10–618(f)(1) only if the denial involves an investigative file concerning an ongoing police investigation. We agree with the appellees' analysis of 10–618(f)(1).

The purpose and construction of the MPIA was recently analyzed by the Court of Appeals in *Office of Governor v. Washington Post Co.*, 360 Md. 520, 759 A.2d 249 (2000). The Washington Post had requested, pursuant to the MPIA, copies of the telephone records of Governor Parris Glendening and two of his most important aides. *Id.* at 526, 759 A.2d 249. Access to the records was denied by the governor on the basis, *inter alia*, of executive privilege. *Id.* at 561, 759 A.2d 249.

In the Washington Post case, Judge Eldridge, for the Court, said:

[I]t would be useful to underscore certain well-established general principles governing the interpretation and application of the Maryland Public Information Act. This Court recently reiterated in *Kirwan v. The Diamondback*, 352 Md. 74, 80–81, 721 A.2d 196, 199 (1998), that

"[t]he Maryland Public Information Act establishes a public policy *and a general presumption in favor of disclosure of government or public documents.* The statute thus provides (§ 10–612(a) and (b) of the State Government Article):

'(a) *General Right to information.*—All persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees.

(b) *General construction.*—To carry out the right set forth in subsection (a) of this section, unless an unwarranted invasion of the privacy of a person in interest

would result, this Part III of this subtitle shall be construed in favor of permitting inspection of a public record, with the least cost and least delay to the person or governmental unit that requests the inspection.' "

Accordingly, as we pointed out in *Kirwan,* 352 Md. at 84, 721 A.2d at 200, *"the statute should be interpreted to favor disclosure." See also, e.g., Office of the Attorney General v. Gallagher,* 359 Md. 341, 343, 753 A.2d 1036, 1037 (2000)("the Act is to be constructed in favor of disclosure"); *Office of State Prosecutor v. Judicial Watch, Inc.,* 356 Md. 118, 134, 737 A.2d 592, 601 (1999)("It is the policy of this State that its citizens have 'access to information about the affairs of government' "); *Fioretti v. Maryland State Board of Dental Examiners,* 351 Md. 66, 73, 716 A.2d 258, 262 (1998)(the statute embodies the principle that citizens " 'be accorded wide-ranging access to public information' "); *Mayor and City Council of Baltimore v. Maryland Committee Against the Gun Ban,* 329 Md. 78, 80–81, 617 A.2d 1040, 1041 (1993); *Cranford v. Montgomery County,* 300 Md. 759, 771, 481 A.2d 221, 227 (1984)("Without doubt the bias of the Md. Act is toward disclosure"); *Faulk v. State's Attorney for Harford County,* 299 Md. 493, 506–07, 474 A.2d 880, 887 (1984); *A.S. Abell Publishing Co. v. Mezzanote, supra,* 297 Md. [26,] 32, 464 A.2d [1068,] 1071 [ (1983) ]; *Superintendent v. Henschen,* 279 Md. 468, 473, 369 A.2d 558, 561 (1977); *Haigley v. Dept. of Health,* 128 Md.App. 194, 226–227, 736 A.2d 1185, 1201–1202 (1999). Concomitantly, *"courts must interpret the exemptions narrowly," Fioretti v. Board of Dental Examiners, supra,* 351 Md. at 77, 716 A.2d at 264.

Moreover, "the public agency involved bears the burden in sustaining its denial of the inspection of public records." *Fioretti,* 351 Md. at 78, 716 A.2d at 264. *See Cranford v. Montgomery County, supra,* 300 Md. at 771, 481 A.2d at 227. . . .

*Id.* at 544–45, 759 A.2d 249 (emphasis added).

Later in the *Washington Post Case,* the Court observed:

[T]he Maryland Public Information Act does not contain a general "catchall" public interest exemption. Instead, for a record to be exempt from disclosure because of the "public interest," it must fall within one of the specific categories set forth in § 10–618. *See Kirwan v. Diamondback, supra,* 352 Md. at 87–88, 721 A.2d at 202–203; *Cranford v. Montgomery County, supra,* 300 Md. at 770, 481 A.2d at 226–227. The records at issue in the present case fall within none of the categories delineated in § 10–618.

*Id.* at 554, 759 A.2d 249 (footnote omitted).

More recently, in *Prince George's County v. Washington Post Co.,* 149 Md.App. 289, 815 A.2d 859 (2003), we dealt with the issue, *inter alia,* of whether Prince George's County had met its burden of proving that an MPIA exemption applied to eight closed C.I.D. (Criminal Investigation Division) reports involving "police-involved shooting and in-custody death cases." *Id.* at 300, 815 A.2d 859. Prince George's County denied the Washington Post access to those C.I.D. reports based on SG § 10–618(f)(1). Its only explanation was that "disclosure would be contrary to the public interest." *Id.* at 333, 815 A.2d 859. We noted that in regard to the police investigation exception set forth in section 10–618(f)(1) there was a distinction between open and closed investigative reports. *Id..* We held that the very general assertion by Prince George's County that releasing the reports would be contrary to the public interest was insufficient. *Id.* at 332–33, 815 A.2d 859 ("The record is absent any information concerning the public harm that might be caused by the release of the closed C.I.D. records"). Because Prince George's County had produced no evidence that release of the C.I.D. records would cause public harm, we affirmed the trial court's order releasing to the Washington Post the closed investigation files. *Id.* at 333, 815 A.2d 859. That affirmance was in accord with the principle that exceptions to MPIA are to be narrowly construed. *Fioretti v. Maryland State Bd. of Dental Exam'rs,* 351 Md. 66, 77, 716 A.2d 258 (1998).

The cases relied upon by appellant, which have held that no detailed explanation need be given by a police department when, pursuant to section 10–618(f)(1), access to a police investigation file is denied, involved, without exception, cases where disclosure would necessarily have interfered with law enforcement proceedings, i.e., cases that are open. *See Judicial Watch*, 356 Md. at 136–38, 737 A.2d 592, and *Faulk v. State's Attorney*, 299 Md. 493, 511, 474 A.2d 880 (1984), and cases therein cited.

■ In cases where defendants are awaiting trial or whether criminal investigations are ongoing, the reason why it is in the public interest to withhold the contents of an investigative file is obvious, i.e., disclosure almost always would "interfere with law enforcement proceedings." *Faulk*, 299 Md. at 508, 474 A.2d 880.

In *Faulk, supra*, the Court was called upon to interpret the predecessor of section 10–618(f)(1). The *Faulk* Court said:

> [T]he State is not required to make a particularized showing that the disclosure of investigatory police reports compiled for law-enforcement purposes to a defendant in a pending criminal proceeding would interfere with that pending criminal proceeding. Rather, a generic determination of interference can be made whenever a defendant in a pending criminal proceeding seeks access to investigatory police reports relating to that pending criminal proceeding. In short, the Maryland Public Information Act does not require the disclosure of investigatory police reports compiled for law-enforcement purposes to a defendant in a pending criminal proceeding.

356 Md. at 137, 737 A.2d 592.

The Court of Appeals, in the *Judicial Watch* case, discussed its reasoning in *Faulk*:

> Underlying our reasoning was the conclusion that "the General Assembly did not intend to preclude generic determinations of interference *when the circumstances were such that disclosure of the requested materials necessarily 'would interfere' with law-enforcement proceedings.*" *Id.* at

508, 474 A.2d at 888. That conclusion was compelled by the fact that "[t]here [was] nothing in the language or the legislative history of § 3(b)(i)(A) to indicate that the General Assembly intended to require a case-by-case showing that disclosure *would reveal the State's case prematurely*, result in delay or otherwise create a demonstrable interference with the particular case, and that generic determinations of interference could never be made." *Id.*

356 Md. at 137–38, 737 A.2d 592 (emphasis added).

 In a case like the one *sub judice*, where the police investigation is closed and where there is no danger that disclosure will interfere with ongoing law enforcement proceedings, a particularized factual basis for the "public interest" denial must be put forth in order for the custodian of records to meet his/her burden of proof. Were we to rule otherwise, the custodian would have no meaningful burden to meet, and the requester would be left without any hint as to why the request was denied. Such a ruling would be at odds with our decision in *Prince George's County v. Washington Post*, *supra*.

## IV.

The City argues, in the alternative, that the explanation provided by Ms. Borden at the December 22, 2000, hearing was sufficient to demonstrate why the denial of access to the black book was against the public interest. According to the City, "[t]he [c]ircuit [c]ourt ... misread the record as the custodian's representative who, after a personal review of the documents, applied established principles of law to determine that it was not in the public interest to release the documents and pointed to specific facts to support her conclusion." We disagree.

In our view, Ms. Borden never made it clear why it was in the public's interest that the black book be withheld from inspection. Instead, Ms. Borden resorted to generalities and/or simply pointed to language in the MPIA or case law

and said, in a conclusory fashion, that withholding of the documents was justified based upon the authority cited.

At the December 22 hearing, even after the City's case was re-opened, Ms. Borden's explanation on direct consisted of a review of her legal analysis of various cases cited in a memorandum prepared by the News Post. On direct examination, Ms. Borden made no meaningful attempt to explain exactly why denial of access was in the public interest.

On cross-examination, the following exchange occurred:

Q. [COUNSEL FOR THE NEWS POST]: Are you telling me that the public does not have a right to know and investigate whether particular individuals, who may or may not be prominent citizens and officials of the government, are engaged in illegal sexual conduct with the owner and manager of a bawdy house?

A. [MS. BORDEN]: The question is does the public have a right to know that?

Q. Yes. And to investigate that.

A. I will say yes.

Q. And does the public have a right to know and investigate that in the event that the police elect not to investigate?

A. I think, generally, the public has a right to know.

Q. And to investigate?

A. I would say, yes. It stems from their rights and [one (1) word inaudible], so, yes. Yes.

Q. And if individuals are accused of that activity, are you saying the public doesn't have the right to know who those individuals are in order to investigate whether, in fact, they are so engaged, especially if they're government officials?

A. I think I have to disagree with that.

Q. You think the answer then would be no?

A. The answer would then be no.

Q. Even if the problem is that the police may themselves be involved and, therefore, would not conduct the investigation themselves?

A. My answer is that there are procedures for investigating police misconduct and that you have to let those procedures happen.

Q. What are those procedures? Those procedures are, are they not, that the public has a right to supervise the conduct of the police, correct?

A. The public supervises the conduct of their police—directly supervises through their officials. I mean the mayor is the direct supervisor.

Q. But if the officials aren't acting, who does?

A. The public—there is a procedure for the public to initiate investigations of the police department.

Q. By whom?

A. If it includes someone so high up in the police department, like the Chief of Police, then you get the procedures as you get an outside person, outside investigator to come in and investigate.[8]

Q. And that person would have access to those files?

A. Yes, under the whole system that's set up.

Q. But the public wouldn't?

A. I guess that would be the investigator's call.

Ms. Borden justified the refusal to release the contents of Ms. Potter's black book, in part, based on an excerpt she read to the hearing officer from the case of *Mayor and City Council of Baltimore v. Maryland Committee Against the Gun Ban,* 329 Md. 78, 617 A.2d 1040 (1993), *viz:*

The Committee points to Major Blackwell's statement that there were no "anonymous" sources in the particular investigation at hand as undercutting confidentiality. This case does not involve an anonymous tipster; nor does it involve a "usually reliable source" whose identity is kept secret throughout the proceedings, but whose information

---

**8.** There is an old maxim that "public officials tend to trust other public officials." Ms. Borden's testimony suggests that the maxim still may have validity. But the press, as surrogates for the public, is under no obligation to accept at face value the truth of what public officials say.

forms part of probable cause. Here we deal with persons whose identities are known to the investigators and to the police officials who reviewed the investigation. The identities are known also to the Complaint Evaluation Board. Had disciplinary charges been formally filed and a disciplinary hearing conducted, the witnesses both in support of and in defense of the charges ordinarily would be identified to the hearing officers and on judicial review. On the other hand however, where, as here, the investigation concludes with a determination that the allegations are not sustained, fairness to the investigated officers and the avoidance of needless publicity to the cooperating witnesses, with possible inhibiting effects on future investigations, justify on public interest grounds the custodian's denial of inspection to one other than a person in interest.

*Id.* at 94–95, 617 A.2d 1040.

The case at hand is markedly different from the *Gun Ban* case. Here, the requesters did not seek any reports or other investigative documents prepared by the police. The plaintiffs simply wanted to see what the police had seized, most particularly Ms. Potter's customer list. No one looking at the seized material could possibly tell who were cooperating witnesses. And, while it is true that the police, when preparing a report, might say who has cooperated with them or might list their confidential informants, here the subject of the investigation had not even been arrested prior to the raid. Consequently, there was zero likelihood that Ms. Potter's black book would divulge who had cooperated with the police. Moreover, there was no danger of defaming an *innocent* subject of the investigation. As Ms. Borden admitted, the police only investigated one person—Ms. Potter—who pleaded guilty in open court to operating a house of assignation.

As the City points out, Ms. Borden also testified that the reason she denied release of the records seized in the raid was the "avoidance of needless publicity to cooperating witnesses, fairness to those investigated, and possible inhibiting factors in future investigations." She also said that prior to the denial

she weighed whether disclosure "would contribute significantly to public understanding of government operations or activities, disclosure of sources of information, personal privacy issues for those not subject to the investigation and fairness."

In regard to the first ground, Ms. Borden testified that some persons named in the black book had cooperated with the police, and she wanted to protect them from needless publicity, but she did not say that anyone had been promised anonymity. Given Ms. Borden's admission that the public did have a right to know and investigate whether public officials were "engaged in illegal sexual conduct with the owner ... of a bawdy house," coupled with the fact that no one could tell from the seized documents who had cooperated with the police, we fail to see how the possible publicity generated by a release of the documents could legitimately be characterized as "needless." Although, conceivably, there might be such a legitimate explanation, Ms. Borden failed to provide it.

■ Admittedly, revelation of the names listed in the black book might embarrass Ms. Potter's customers. But the invasion of their privacy in this way cannot be characterized as "unwarranted" when balanced against the public's right to know and evaluate information of this sort. *See Post–Newsweek Stations, Florida, Inc. v. Doe,* 612 So.2d 549 (Fla.1992)(holding that *private* citizens alleged to have been clients of an accused prostitute lacked a privacy interest prohibiting the disclosure of their names to the public); *Yakima Newspapers, Inc. v. City of Yakima,* 77 Wash.App. 319, 890 P.2d 544 (1995)(holding that the fact that the settlement agreement contained private details concerning a fire chief did not shield it from disclosure as an invasion of privacy). *See also Police Patrol Sec. Sys. v. Prince George's County,* 378 Md. 702, 838 A.2d 1191 [2003] ("The Maryland Public Information Act does not contain an exception for particular cases whenever the disclosure of a record might cause an 'unwarranted invasion of privacy.'" (quoting *Kirwan v. The Diamondback,* 352 Md. 74, 88–89, 721 A.2d 196 (1998))).

Ms. Borden gave no meaningful explanation as to how release of the black book document could possibly constitute "an inhibiting factor in future investigations" of crimes. She admitted that no future investigations of Ms. Potter were planned. And, release of the documents would not reveal the thought process of any police officer or divulge police procedures inasmuch as the requesters sought only what Ms. Potter had previously possessed.

Release of the customer list in Ms. Potter's black book may show that (1) the allegations that public officials and/or prominent public figures were involved with Ms. Potter's illicit enterprise or (2) Ms. Edmonds's allegations were groundless. But either way, the "public's understanding of government ... activities" would be advanced because it would help to prove or disprove Ms. Edmonds well-publicized allegations against the police department. Moreover, the City, at least at the time of the hearing on the summary judgment motion, was not concerned that any future police investigation would be jeopardized by disclosure or that cooperating witnesses would be needlessly exposed to unwarranted publicity. This is evidenced by the fact that the City, even though it had no idea what black book material had or had not been shredded, told the court that it "would welcome" release to the plaintiffs of the black book items in the court's custody. Likewise, the City's willingness to urge release of all black book items in storage, plainly demonstrated that the City, in fact, had no bona fide concerns with either "fairness to those not subject to investigation" or, more generally, fairness to those named in the black book.

The City also argues that Ms. Borden's analysis complied with the public interest factors set forth in "§ 10–618(f)(2)(i) (interference with a valid and proper law enforcement proceeding), § 10–618(f)(2)(ii) (depriving another person of a right to a fair trial or an impartial adjudication), § 10–618(f)(2)(iii) [and] § 10–618(f)(2)(iv) (disclose the identity of a confidential source)." (Reference to appendix omitted.)(Footnote omitted.) This argument is purely make-weight. At the time of the denial, no "law enforcement proceeding" existed—the police

investigated only Ms. Potter and that case was closed. For the same reason, there was no danger of interfering with any trial or other adjudication. Lastly, release of the documents would not reveal the identity of a confidential source because the requesters wanted seized documents—not reports or other documents prepared by the police that might contain the names of police informants.

In addition to what we have already said, we agree with the News Post when it asserts:

The documents [sought by appellees] fall squarely within the core values fostered by the Act. The News Post has emphasized time and time again that it is not interested in reviewing the names of those private persons identified in the documents; it only seeks disclosure of such public figures and officials whose names may be found. As representatives of both the News Post and the Associated Press testified, there have been widespread, credible, publicly asserted allegations of a police cover-up to protect from investigation government officials and prominent public figures patronizing Ms. Potter's establishment. There have also been allegations that members of the police department are using the documents to blackmail these individuals. *Id.* Investigation of such allegations goes to the very core of the values protected by the Act and the First Amendment itself.

The presence of a public person's name on the list—particularly if that person were a high ranking official of the City's police department—clearly would shed light upon the inner-workings of that department, and perhaps explain why that which persons within the department boasted would be a large "bust," ended up quietly. Unlike the rap sheet at issue in [*United States Department of Justice v.*] *Reporters Committee,* [489 U.S. 749, 109 S.Ct. 1468 (1989) ], the documents here directly reflect upon the conduct of the public officials there identified. *Cf., The Nation Magazine v. United States Customs Service,* 71 F.3d 885, 895 (D.C.Cir. 1995) (former Presidential candidate H. Ross Perot's privacy concerns about public documents relating to him yield when they shed light upon agency action).

Given the allegations of police corruption in this matter, the public has a right to determine for itself whether its law enforcement officials are applying the law fairly, even-handedly, and in a manner free of corruption. At the same time, the public also has a right to know if these charges of illegal or corrupt practices by public persons do or do not have merit. *Miner* [*v. Novotny* ], 304 Md. [164,] 177, 498 A.2d 269 [ (1985) ](citing *Berkey,* [*v. Delia,* 287 Md. 302, 413 A.2d 170 (19870)]("[w]e are satisfied, however, that the inhibition of citizens' criticism of those entrusted with their protection is a far worse evil"). Absent disclosure, the public will never know anything more than the police department wants it to know.

(Reference to record extract omitted.)

For all the above reasons, we hold that the motions judge was correct when he ruled that the City had failed to meet its burden of justifying the denial of documents contained in the black book.[9]

## V.

The City contends:

The circuit court failed to consider the interests of Potter and other persons in interest under the Public Information Act, including denial mandated by State Government Code, §§ 10–615 and 10–617.

The City first asserts that Ms. Potter and everyone else named in the black book were "person(s) in interest" as

---

9. Appellant argues that the appellees "failed to meet their burden of proof to establish that the custodian of records did not reasonably believe that the denial was in the public interest." There are two answers to that argument. First, the burden of proving the denial of access was justified is on the City—not the appellees. *See* SG § 10–623(b)(2)(i). Second, in light of the City's representation to the motions judge that it "would welcome" disclosure to the appellees of the black book items in the custody of the court, even though the City did not know which of the black book items were in the court's custody, it is obvious that the City had no reasonable belief that keeping secret the contents of the black book documents in its possession was "in the public interest."

defined in SG 10–611(e)(1), and also, the court overlooked the fact that SG 10–612(b) provides:

> *General construction.*—To carry out the right set forth in subsection (a) of this section, *unless an unwarranted invasion of the privacy of a person in interest would result,* this Part III of this subtitle shall be construed in favor of permitting inspection of a public record, with the least cost and least delay to the person or governmental unit that requests the inspection.

(Emphasis added.)

In support of that argument, appellant cites *Maryland Committee Against the Gun Ban, supra,* for the proposition that "each person in interest has an expectancy of privacy." The last-quoted contention is too broad, and by its breadth is unsupported by the *Gun Ban* case or any other precedent. In any event, as we have already said, Ms. Borden failed to present facts showing that disclosing the information requested would constitute "an unwarranted invasion of" the privacy rights of either Ms. Potter or her customers.

█ The City also claims that the denial of access was justified by exemptions contained in SG sections 10–615 and 10–617. The short and complete answer to that contention is that the custodian of records is required under the MPIA to explain to the requester the reason for denial. Ms. Borden in her written response to the request never justified denial of access based on sections 10–615 or 10–617; likewise, in her December 22, 2000, testimony, which was relied upon by both parties at the motions hearing, she never claimed that denial was based on those sections of the MPIA. Under such circumstances, the motions judge did not err by failing to consider the provisions of sections 10–615 or 10–617.[10]

---

10. We also note that, before the motions court, the City did not contend that denial was justified under sections 10–615 or 10–617. *See* Md. Rule 8–131(a)(Ordinarily, except for jurisdictional issues, we will not decide issues neither raised nor decided below.).

## VI. *THE CROSS-APPEAL*

The News Post takes issue with the portion of the court's order that prohibited the plaintiffs from publishing any names in the black book "except for public officials and/or public figures." The News Post maintains that it

is interested only in the conduct of the City's public officials, public figures and police department. Nevertheless, the lower court's Order puts the News Post at risk of contempt proceedings, even if the individual could not prove that the individual was harmed by inadvertent disclosure. [*Balti-more Sun Co. v. State* ], 340 Md. [437,] 452, 667 A.2d 166 [ (1995) ]. The threat of contempt clearly chills the News Post's First Amendment rights. The [c]ourt cannot in accordance with the dictates of the First Amendment exact a "promise" from the media that it not print information lawfully obtained.

The City says in its reply brief that the attempted restraint is "upon some ill-defined portion or category of individuals whose names appear in Potter's records." Thus, the parties are in agreement that the prohibition in the court's orders as to "public figures" and "public officials" is ill-defined.

In its cross-appeal, the News Post places primary reliance upon *Baltimore Sun Co. v. State*, 340 Md. 437, 667 A.2d 166 (1995), where the Court said:

The First Amendment to the United States Constitution provides that "Congress shall make no law … abridging the freedom … of the press." The Supreme Court "has interpreted these guarantees to afford special protection against orders that prohibit the publication or broadcast of particular information or commentary—orders that impose a 'previous' or 'prior' restraint on speech." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 556, 96 S.Ct. 2791, 2801, 49 L.Ed.2d 683 (1976). Because "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights," *id.* at 559, 96 S.Ct. at 2803, any prior restraint bears a heavy presumption against its constitutional validity. *Organization for a Better*

*Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577–78, 29 L.Ed.2d 1 (1971). Before a prior restraint can be deemed constitutional, a court must determine that the magnitude of the danger the restraint seeks to prevent, "discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." *United States v. Dennis*, 183 F.2d 201, 212 (2d Cir.1950)(Hand, J.), *aff'd*, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), *quoted in Nebraska Press Ass'n, supra*, 427 U.S. at 562, 96 S.Ct. at 2804.

*Id.* at 447–48, 667 A.2d 166.

The City's response to the argument made by the News Post in its cross-appeal is succinct, *viz:*

> The court's order of November 7, 2001[,] does not constitute a prior restraint in that the court did not have authority to order the release of the documents to the newspaper.

This response, at least when read with other portions of the City's reply brief, makes it clear that when the City says that the court "did not have authority" to release the black book to the "newspapers" it means the court erred in ordering the release. This is simply a repeat of its earlier argument, which we have already addressed and rejected.

■ We hold that the restrictions against publications should not have been imposed and therefore must be stricken. Our reasons are three: (1) under the MPIA, once a court decides that a party should be granted access to public records, nothing in the statute gives the court the right to restrict the publication of those records; (2) in this case, the "magnitude" of the danger the prior restraint seeks to prevent is minuscule and, therefore, does not justify the restraint; and (3) because the ambit of the prior restraint is so ill-defined, that restraint would, as the News Post contends, "chill" its First Amendment rights.

**THE PORTION OF THE PARTIAL SUMMARY JUDGMENT ORDERS THAT RESTRICTS THE APPELLEES' RIGHT TO PUBLISH SHALL, UPON REMAND, BE STRICKEN; ALL OTHER PORTIONS OF THE ORDER**

GRANTING PARTIAL SUMMARY JUDGMENT ARE AF-FIRMED;

COSTS TO BE PAID BY APPELLANT.